524 July 16, 2015 No. 27

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

CHAD ALLEN BEAUVAIS,
*Petitioner on Review.*

(CC 06FE0574SF; CA A147355; SC S062346)

En Banc

On review from the Court of Appeals.*

Argued and submitted March 9, 2015, at Willamette University College of Law, Salem, Oregon.

Neil F. Byl, Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was Peter Gartlan, Chief Defender.

Carson L. Whitehead, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

BREWER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

_____

* Appeal from Deschutes County Circuit Court, Stephen P. Forte, Judge. 261 Or App 837, 322 P3d 1116 (2014).

**BREWER, J.**

Defendant appeals a judgment convicting him of a single count of first-degree sex abuse. ORS 163.427. He assigns error to the circuit court's denial of his motion *in limine* to exclude expert witness testimony concerning a diagnosis of child sexual abuse, as well as the evaluative criteria underlying that diagnosis that, in defendant's view, impermissibly commented on the credibility of the complaining witness in this case.[1] The Court of Appeals affirmed defendant's conviction. *State v. Beauvais*, 261 Or App 837, 322 P3d 1116 (2014). For the reasons now explained, we affirm the decision of the Court of Appeals and the judgment of the circuit court.

## I.    FACTS AND PROCEDURAL BACKGROUND

At the time of the charged incident, KS was ten years old.[2] While babysitting defendant's son, KS and her friend, JC, fell asleep on the living room floor of defendant's home. In the early morning, KS woke up to find defendant kneeling over her with his hand down her pants, touching her vaginal area. When a door opened down the hall, defendant left the room, and KS sat up. Defendant returned to the room and asked KS if she was okay. KS replied that she had a headache and would go back to sleep. When defendant left the room again, KS woke JC and told her that defendant had touched her "private area" and that she wanted to go home. KS called her mother and asked to be picked up from defendant's home. JC's father picked the girls up and, based on KS's disclosure that defendant had touched her private area, took the girls to the police station.

Later that day, White, a sexual assault nurse examiner, examined the girls. In her examination of KS, White found increased redness and swelling of the clitoris and upper labial folds, increased redness in the upper and

---

[1] Defendant also assigned error in the Court of Appeals to the denial of his motion to sever charges and the denial of a motion for mistrial. The Court of Appeals rejected those assignments of error, and defendant did not pursue his challenge to those parts of the Court of Appeals' decision before this court. Accordingly, we do not address them on review.

[2] On review, defendant challenges the trial court's pretrial rulings. We take the facts from the evidence brought out at the pretrial hearing. To the extent that a dispute exists, we state the facts consistently with the trial court's rulings.

lower portions of the hymen, and some abrading of the labia. White referred KS to the Kids Intervention and Diagnostic Service Center (KIDS Center), a child abuse intervention center, for a follow up evaluation. About six weeks after the incident, Glesne, a staff interviewer, interviewed KS at the KIDS Center, and Dr. Kyriakos performed a physical examination of KS. Following that examination, Kyriakos made a diagnosis that KS had been sexually abused.

Defendant was charged with one count of first-degree sexual abuse of KS.[3] Before trial, defendant moved *in limine* to exclude evidence of the KIDS Center evaluation. In that motion, defendant sought to preclude Kyriakos and Glesne from testifying "as to what [KS] told them and \*\*\* that in their opinion they believe that [KS] was sexually abused." Defendant argued that such testimony was hearsay and without sufficient foundation. The state responded that the evidence was admissible because it was relevant, it would assist the trier of fact under OEC 702,[4] and it should not be excluded under OEC 403.[5]

In a reply brief, defendant expanded the scope of his motion *in limine* by seeking to exclude "evidence of a diagnosis of child sexual abuse" and "any and all other evidence that possesses the increased potential to influence the trier of fact as scientific evidence, technical evidence, and/or other evidence concerning specialized knowledge." Defendant argued that such evidence was irrelevant under OEC 401, invalid as scientific evidence under OEC 702, and unfairly prejudicial under OEC 403. *See State v. Brown*, 297 Or 404,

---

[3] Defendant also was charged with two counts of attempted first-degree sexual abuse of JC relating to a different incident. Those charges were dismissed at trial.

[4] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[5] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

438-39, 687 P2d 751 (1984) (setting out test for admission of scientific evidence). Defendant also asserted that the KIDS Center evidence as a whole impermissibly commented on KS's credibility. As pertinent to the issues before us, defendant argued that

> "[t]he scientific, technical or other specialized knowledge will not assist the trier of fact in understanding the evidence or determining a fact in issue. Defendant will argue that the proffered testimony does not constitute a complex or 'superficially bizarre' phenomenon outside the experience of most jurors. Rather, the proffered testimony concerns a straight-forward matter well within the common experience of most jurors."

Defendant also argued that "[a]ny such evidence would be an impermissible comment on the credibility of another witness," citing *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983) ("[I]n Oregon[,] a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth.").

At a pretrial hearing on defendant's motion *in limine*, Kyriakos testified about the KIDS Center interview and evaluative processes, how a diagnosis of child sexual abuse is made, and her evaluation of KS. Kyriakos stated that, in evaluating a child for sexual abuse, she looks for physical signs that are "diagnostic" of abuse. She also gathers histories from the child, caregivers, and others, including law enforcement and other referral sources. According to Kyriakos, the KIDS Center follows accepted national and state criteria, which, in addition to physical evidence, include consideration of (1) consistency in the core details that the child has given over time to law enforcement, caregivers, and others, as well as the information the child provides at the KIDS Center; (2) whether the child was able to give multiple, in depth, and contextual details; (3) whether the child provided information in more than one media form, including verbally, through drawings, and by using the child's own body as a reference; (4) whether the disclosure of abuse was made spontaneously or whether the child was asked about it first; (5) whether the child provided specific details regarding sensory-type information, such as something that

the child felt; and (6) behavioral changes.[6] According to Kyriakos, behavioral changes do not necessarily establish that abuse occurred, but they are "concerning."

Insofar as this case is concerned, Kyriakos testified that she reviewed White's report of her physical examination of KS and noted that White had found redness, swelling, and abrasions on KS's vaginal area. Those physical findings were important to Kyriakos because White had examined KS on the day of the charged incident; Kyriakos could not discern an explanation for the redness, swelling, and abrasions, other than sexual abuse. Kyriakos did not find any physical signs of sexual abuse in her examination of KS, but she was not surprised, because those symptoms usually resolve within days.

Kyriakos testified at length about her application of the evaluative criteria to KS. She stated that the core details that KS had described were consistent with the core details that she had recounted to police officers, her mother, and White. In addition, KS provided multiple details, including a description of the room and furniture where the abuse had occurred and how defendant's body had been positioned. KS also described the incident through multiple media, including a verbal description, a drawing, and by using her own body as a reference. During the interview, KS got down on the floor to demonstrate defendant's position when she woke up to find him on top of her. She also used her body to describe where defendant had touched her. During the physical examination, Kyriakos placed her fingers on the outside of KS's labia, and KS was able to tell Kyriakos that defendant had touched her "more inside." Kyriakos stated that KS's disclosure of the abuse also had been spontaneous, in that she woke JC to tell her what had just happened and

---

[6] Those criteria are described in the Forensic Evaluation Critical Analysis Guide, published by the National Children's Advocacy Center. The criteria also are part of the Oregon Medical Guidelines for Evaluation of Sexual Abuse in Children and Adolescents and the Oregon Interviewing Guidelines, which establish practice standards for child abuse investigations in Oregon and are followed by the KIDS Center and other child abuse intervention centers in Oregon. In *State v. Southard*, 347 Or 127, 138-39, 218 P3d 104 (2009), this court concluded that "the methodologies that the KIDS Center used to diagnose child sexual abuse" indicated that "the diagnosis [of child sexual abuse] possesses sufficient indicia of scientific validity to be admissible."

then promptly contacted her mother. Furthermore, KS used sensory details to describe the incident, stating that she had felt a stinging sensation after defendant had touched her. According to Kyriakos, that detail "would only likely be known if the child had actually experienced the sensation." Finally, Kyriakos stated that behavioral changes that KS's mother had observed in KS since the incident—being more fearful, not wanting to be alone, not wanting to sleep by herself, a change in appetite, sadness, and withdrawal—were relevant to her evaluation. Based on her overall evaluation, Kyriakos testified that she had concluded to a reasonable degree of medical certainty that KS had been sexually abused.

At the close of the pretrial hearing, defendant objected to the testimony of Glesne and Kyriakos, as well as the KIDS Center report and a DVD of Glesne's interview of KS, on the ground that the factual determination whether KS had been sexually abused was not complex and expert testimony was not needed. Defendant reiterated his general objection that the KIDS Center evidence was a comment on the credibility of the witness and that it was "just [a] technique[] to be able to introduce evidence to juries to bolster the credibility of child witnesses, to convince the jury that they should convict based upon a blanket imprimatur of medical certainty." According to defendant, the evaluative criteria to which Kyriakos testified and that were discussed in the report were "simply a shorthand way of saying that the child is believable."

In addition to the foregoing general objections, defendant specifically objected to the following exchange in Glesne's DVD interview of KS on the ground that it was an impermissible comment on KS's credibility:

"Q: Has anybody … or did anybody, I guess is a better way of putting this, told you what to say today?

"A: No."

The trial court denied defendant's motion *in limine*.

At trial, Zancanella, the KIDS Center interviewer who had interviewed JC, and Glesne described the criteria used in evaluating child sexual abuse. Glesne also testified about her interview of KS, and Kyriakos testified about the details of her

examination and evaluation of KS and gave her medical diagnosis of child sexual abuse. Defendant did not object to any of that testimony. Nor did defendant object to the admission into evidence of the KIDS Center report or the DVD.

A jury ultimately convicted defendant of first-degree sexual abuse, and the trial court sentenced him accordingly. As noted, on appeal, defendant assigned error to the trial court's order denying his motion *in limine*. Before the Court of Appeals, defendant reprised his pretrial arguments that Kyriakos's diagnosis of sexual abuse was inadmissible and that the KIDS Center evidence explaining the bases for that diagnosis constituted impermissible vouching for KS's credibility. In a refinement of those arguments, defendant relied on this court's decision in *State v. Southard*, 347 Or 127, 140-41, 218 P3d 104 (2009), for the proposition that a diagnosis of sexual abuse that is based in part on physical evidence, but also includes evidence that the complainant exhibited behavior consistent with having been sexually abused, is inadmissible; defendant also relied on this court's decision in *State v. Lupoli*, 348 Or 346, 362, 234 P3d 117 (2010), for the proposition that, even if a diagnosis of sexual abuse is admissible, expert witness testimony about the attributes of a truthful statement, followed by testimony that another witness's statement contained those attributes of truth, is inadmissible to explain such a diagnosis.[7]

The Court of Appeals affirmed the trial court's denial of defendant's motion *in limine*. Relying in part on *Southard*, that court concluded that the admissibility of a diagnosis of sexual abuse when physical evidence of abuse is present is subject to a balancing test under OEC 403. *Beauvais*, 261 Or App at 843. Applying factors that it previously had described in *State v. Ovendale*, 253 Or App 620, 630, 292 P3d 579 (2012), the court concluded that the diagnosis was admissible because: (1) the significance of the physical evidence was "a complex factual determination that an expert was better able to make than a layperson;" (2) the physical evidence had corroborated the type of abuse alleged in this case; and (3) Kyriakos had relied on the physical evidence in

---

[7] The charged incident occurred in 2006. Defendant's motion *in limine* was decided in 2007. Both *Southard* and *Lupoli* were decided after the trial court decided the motion *in limine* but before defendant was tried and convicted in 2010.

arriving at a diagnosis that KS had been sexually abused. *Beauvais*, 261 Or App at 843-44.

The Court of Appeals further concluded that the expert testimony explaining and applying the subsidiary principles of the sexual abuse diagnosis—the characteristics that bear on an evaluation of a child for sexual abuse—and KS's specific characteristics in relation to those principles, were "explanations for the admissible diagnosis of sexual abuse that are not tantamount to comments on truthfulness and that would assist the jury in determining whether [KS's] complaints were well founded." *Id.* at 849.

We allowed defendant's petition for review to consider the admissibility of a medical diagnosis of child sexual abuse when physical evidence of abuse is present and whether the expert testimony explaining the evaluative criteria underlying the diagnosis in this case impermissibly vouched for the credibility of KS.

## II.   ANALYSIS

### A.   *The Record on Review*

As pertinent to both issues before us, we note that defendant challenges the trial court's pretrial denial of his motion to exclude evidence, not the particular evidence that was admitted at trial. That procedural posture frames our review. To be sure, a pretrial objection to evidence can preserve the issue of its admissibility for review. *State v. Foster*, 296 Or 174, 183-84, 674 P2d 587 (1983) (when defendant made sufficient offer of proof of what would happen at trial to permit trial court to rule intelligently on admissibility of evidence and court made final ruling, "[t]here was no need for any further procedure to preserve the assignment of error"). However, the scope of the record on review is limited to the record before the trial court when it made the challenged ruling. *State v. Pitt*, 352 Or 566, 574-75, 293 P3d 1002 (2012).

### B.   *Admissibility of the Medical Diagnosis of Child Sexual Abuse*

The starting point for our analysis of defendant's challenge to the medical diagnosis of child sexual abuse in this case is this court's decision in *Southard*. In that case,

the defendant challenged a diagnosis of child sexual abuse from a KIDS Center physician that was based entirely on the child's statements and history. The issue before the court was "whether a diagnosis of 'sexual abuse'—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of any physical evidence of abuse." *Southard*, 347 Or at 142. The court first concluded that a medical diagnosis of child sexual abuse was relevant under OEC 401 and, as noted, that the KIDS Center methodologies possessed sufficient indicia of scientific validity for the diagnosis to be admissible under OEC 702. *Id.* at 138-39. However, the court held that, in the absence of corroborating physical evidence, the diagnosis was inadmissible under OEC 403 because its probative value was substantially outweighed by the danger of unfair prejudice. The probative value was slight, the court reasoned, because a diagnosis of child sexual abuse differs from other medical diagnoses that "turn on an abstruse matter of science," in that it purports to determine whether conduct—an act of sexual abuse—occurred, and that determination is often within the competence of a lay trier of fact. *Id.* at 134-35. Because the diagnosis in *Southard* did not tell the jury anything that it could not determine on its own, its probative value was slight. *Id.* at 140.

On the other side of the scale, the court found that the risk of prejudice was great:

> "The fact that the diagnosis came from a credentialed expert, surrounded with the hallmarks of the scientific method, created a substantial risk that the jury may be overly impressed or prejudiced by a perhaps misplaced aura of reliability or validity of the evidence. *** [T]he diagnosis is particularly problematic because the diagnosis, which was based primarily on an assessment of the boy's credibility, posed the risk that the jury [would] not make its own credibility determination, which it is fully capable of doing, but [would] instead defer to the expert's implicit conclusion that the victim's reports of abuse are credible."

*Id.* at 140-41 (citations and internal quotation marks omitted). Ultimately, "the risk that the jury will defer to the expert's assessment outweighs whatever probative value the diagnosis may have." *Id.* at 142.

This case presents an issue that *Southard* foreshadowed but did not resolve, namely, whether and under what circumstances a diagnosis of child sexual abuse is admissible under OEC 403 when physical evidence of abuse is present. Defendant argues that a diagnosis of child sexual abuse that relies in part on physical evidence is inadmissible under *Southard*. In defendant's view, the probative value of such a diagnosis is slight—even if supported by some physical evidence—because the jury is equally capable of assessing the physical evidence, the credibility of the child, and the other evidence admitted at trial to determine whether the alleged abuse occurred. Defendant asserts that, even when a medical expert relies on physical evidence, a sexual abuse diagnosis determines whether relatively uncomplicated conduct—an impermissible sexual touching—has occurred, and a jury can make that determination without expert assistance. As defendant sees it, where physical evidence of abuse exists, an expert should be permitted to testify about whether that evidence is consistent with the alleged sexual contact, but the expert's opinion that sexual abuse occurred does not "turn on an abstruse matter of science," *see Southard*, 347 Or at 135, and, thus, should be left to the trier of fact.

From those propositions, defendant reasons that Kyriakos's diagnosis that KS was sexually abused did little to assist the jury in this case. In addition, defendant asserts that Kyriakos relied primarily on her own assessment of KS's credibility, rather than the physical evidence that White had identified. Defendant notes that, although Kyriakos testified that White's physical findings were significant, Kyriakos's written report did not refer to those physical findings. Defendant also asserts that Kyriakos expressed doubt about the significance of White's findings when she stated that "perhaps" the abrasions could have occurred while KS was bathing.[8] Because the jury was able to draw its own inferences from the physical evidence, defendant argues, the

---

[8] Kyriakos testified at trial that the abrasions on KS's vaginal area "perhaps" may have been self-inflicted while KS was bathing, but Kyriakos did not think that made sense because the abrasions would have been the result of fairly vigorous rubbing or rubbing with something sharp such as a fingernail. Kyriakos stated that a person likely would stop rubbing so vigorously once they began to feel pain.

diagnosis was only slightly probative, and the prejudicial effects that troubled this court in *Southard* preponderated to render the diagnosis inadmissible under OEC 403.

In response, the state contends that a medical diagnosis of child sexual abuse that relies in part on physical evidence provides information to a jury that it could not evaluate as effectively on its own. According to the state, in relying on physical evidence to reach such a diagnosis, an expert draws a causal connection between the allegations of abuse and the physical evidence. The state asserts that a medical expert is uniquely qualified to discern and explain the significance of such a connection to a lay trier of fact. The state argues that a diagnosis supported by physical evidence is helpful because a layperson is not as capable of determining whether physical findings are the result of sexual abuse, as opposed to an alternative cause. As to prejudice, the state notes that, in *Southard*, this court explained that the danger of unfair prejudice when a medical diagnosis of child sexual abuse is not supported by physical evidence is that the jury will defer to the expert's assessment of the child's credibility. *Southard*, 347 Or at 140-41. By contrast, when an expert relies in part on physical evidence, the state asserts that the persuasive force of the diagnosis does not rest on a credibility determination, but, rather, on the expert's explanation of the significance of the physical findings in combination with the child's medical history and the allegations of abuse. Accordingly, the state reasons, a diagnosis of child sexual abuse that relies in part on physical evidence is not unfairly prejudicial.

As those propositions apply here, the state asserts that White's findings were an important factor in Kyriakos's diagnosis because Kyriakos opined that there was no reasonable explanation other than sexual abuse for the injuries to KS's vaginal area. The state further argues that, because Kyriakos relied on White's findings and Kyriakos's diagnosis was helpful to explain the significance of those findings to the jury, the diagnosis was admissible.

In summary, the parties propose opposing bright line rules: Defendant argues that a child sexual abuse diagnosis is never admissible because it has little probative value

and is unfairly prejudicial, while the state argues that such a diagnosis is always admissible if it is supported by some physical evidence because, in that circumstance, its probative value is not substantially outweighed by the danger of unfair prejudice.

As noted, the Court of Appeals determined that the admissibility of a diagnosis of child sexual abuse when physical evidence of abuse is present remains subject to a balancing test under OEC 403. *Beauvais*, 261 Or App at 843. As elaborated below, we agree with that conclusion.

OEC 403 codifies the discretionary power of a trial judge in balancing the probative value of evidence against its unfairly prejudicial effect. *Brown*, 297 Or at 442. However, where the admissibility of scientific evidence is concerned, this court retains its role to set legal limits that govern the exercise of trial court authority under OEC 403. *Id.*; *see also Southard*, 347 Or at 140 n 11. In *Southard*, this court set a limit on the admissibility of a diagnosis of child sexual abuse under OEC 403. We explained:

> "Our holding today is narrow. The only question on review is whether a diagnosis of 'sexual abuse'—*i.e.*, a statement from an expert that, in the expert's opinion, the child was sexually abused—is admissible in the absence of physical evidence of abuse. We hold that where, as here, that diagnosis does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403."

*Southard*, 347 Or at 142.[9] Significantly, this court in *Southard* did not hold that the mere existence of supporting physical evidence would render a medical diagnosis of child sexual abuse *per se* admissible. Nor did the court hold that such a diagnosis is never admissible, even if supported by physical evidence. Instead, the court suggested

---

[9] In *Lupoli*, this court described *Southard*'s holding as follows:

"[A] statement from an expert that, in the expert's opinion, a child had been sexually abused was inadmissible in the absence of physical evidence of abuse, because it does not tell the jury anything that the jury could not have determined on its own, and, therefore, the probative value of any such testimony is outweighed by the danger of unfair prejudicial effect under OEC 403."

*Lupoli*, 348 Or at 357.

that the determination of admissibility in a particular case will depend, among other things, on the extent to which the diagnosis tells the jury something that it could not determine as well on its own and the risk that the trier of fact will improperly defer to what it reasonably could perceive to be a credibility-based evaluation by the expert. *See id.* (holding that "where, as here, [a medical diagnosis of child sexual abuse] does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403").[10]

In light of the concerns expressed in *Southard*, we conclude that the mere presence of physical evidence of abuse is not enough to make a diagnosis of child sexual abuse automatically admissible, when that diagnosis otherwise rests on what a jury reasonably could perceive to be a credibility-based evaluation. Rather, the physical evidence must have more than a speculative or insubstantial connection to the diagnosis; that is, the evidence must meaningfully corroborate the diagnosis. In addition, the expert must

---

[10] In reaching its conclusion, this court in *Southard* cited several decisions from other jurisdictions holding that a medical diagnosis on the "ultimate issue of sexual abuse" is not helpful to the jury and is inadmissible. *Southard*, 347 Or at 141, 143. Consistently with *Southard*, each of those decisions involved diagnoses that were not supported by physical evidence of abuse. *See, e.g.*, *United States v. Charley*, 189 F3d 1251, 1257, 1265, 1271 (10th Cir 1999) (repeatedly emphasizing lack of physical evidence and describing opinions as based "largely" on witness statements); *United States v. Whitted*, 11 F3d 782, 785-86 (8th Cir 1993) (expert was merely reciting the allegation of the alleged victim "in the guise of a medical opinion"); *State v. Iban C.*, 275 Conn 624, 633, 639, 881 A2d 1005 (2005) (emphasizing that diagnosis was based on witness reports, not on physical examination); *Atkins v. State*, 243 Ga App 489, 491, 495-96, 533 SE2d 152 (2000) (expert was unable to opine whether abuse had occurred "based on the current absence of physical evidence of molestation"); *State v. Bantangan*, 71 Haw 552, 554, 558, 799 P2d 48 (1990) (noting at outset that "[t]here was no evidence of physical injury and no third-party witnesses to these incidents," and ultimately holding that expert's "conclusory opinion that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury").

Other courts have held that an expert medical witness may render an opinion that sexual abuse has in fact occurred if the state establishes physical evidence consistent with sexual abuse. *See, e.g.*, *State v. Hammett*, 361 NC 92, 637 SE2d 518 (2002) ("[T]he interlocking factors of the victim's history combined with the physical findings constituted a sufficient basis for the expert opinion that sexual abuse had occurred."); *Warner v. State*, 144 P3d 838, 860 (Okla Crim App 2006) (testimony of physician that child victim had suffered physical and sexual abuse was admissible, where diagnosis was based upon on his observations of victim's injuries, and his testimony assisted jury in understanding cause of injuries found on victim).

significantly rely on the physical evidence in making the diagnosis, so that the evidence is neither incidental nor tangential to the diagnosis. Finally, the diagnosis must involve a complex factual determination "that a lay person cannot make as well as an expert." *See Southard*, 347 Or at 140. As the causal relationship between physical evidence and a diagnosis becomes more complex, that evidence and the expert's interpretation of it increasingly provide jurors with information that is beyond their common experience. *See id.* at 134-35. The issue is not whether the expert's path of reasoning necessarily is beyond the competence of all lay people. In some cases, the causal connection between physical evidence and a diagnosis of child sexual abuse may be sufficiently complex, even though not entirely abstruse, such that expert testimony will assist the trier of fact. *See Middleton*, 294 Or at 435 ("[T]he test is whether the expert's testimony, if believed, will be of help or assistance to the jury." (Citation omitted.)).

When those foundational requirements are satisfied, the probative force of the diagnosis is more likely to derive from the strength of the causal connection between the physical findings and the diagnosis rather than from the expert's assessment of the child's credibility. We therefore hold that, when a jury otherwise reasonably could perceive a medical diagnosis of child sexual abuse to be based on a credibility determination, the diagnosis nevertheless tells the jury something that it is not equally capable of determining on its own if (1) physical evidence meaningfully corroborates the alleged type of abuse; (2) the expert significantly relies on that physical evidence in making the diagnosis of sexual abuse; and (3) the causal relationship between the physical evidence and the diagnosis is sufficiently complex such that a lay trier of fact cannot assess the connection as well as an expert.

The trial court could have determined that the first two requirements were satisfied in this case. With respect to corroboration, KS stated that defendant touched and rubbed her vaginal area with his hand. White's examination report described redness, swelling, and abrasions of KS's vaginal area. Kyriakos testified that she could discern no explanation for KS's injuries other than the alleged sexual abuse.

With respect to reliance, Kyriakos testified in the pretrial hearing that she had reviewed White's report before she had evaluated KS and that she had considered White's findings in reaching her diagnosis. The documented redness, swelling, and abraded areas were "highly concerning" to Kyriakos, because they were observed on the same day as the incident and, again, she could discern no explanation for them other than sexual abuse.[11]

The trial court also could have determined that the third requirement was satisfied in this case. Jurors could appreciate that there were various *possible* causes of the redness, swelling, and abrasions found on KS's vaginal area, but they would not necessarily know the *likely* cause of that physical evidence. Kyriakos's testimony about the significance of the physical evidence involved the application of specialized medical knowledge to diagnostic facts; it was not based on criteria that laypeople are expected to use in their ordinary experience, but, rather, on a medical understanding of a child's physiology. Thus, the causal connection between the physical findings on which Kyriakos relied and her diagnosis of child sexual abuse was sufficiently complex that the trial court could have determined that that expert testimony would assist the jury in assessing that connection.

In sum, the trial court could have concluded that the diagnosis of sexual abuse told the trier of fact something that it could not determine as well on its own. Further, because the diagnosis was based in meaningful part on corroborative physical findings, the trial court could have concluded that the danger of unfair prejudice described in *Southard*—that the jury improperly would defer to the expert's assessment of the complaining witness's credibility—was correspondingly reduced. On balance, therefore, we conclude that the trial court did not abuse its discretion in determining that the probative value of Kyriakos's diagnosis of sexual abuse was not substantially outweighed by the danger of unfair

---

[11] We reject defendant's assertion that Kyriakos did not rely on White's physical findings as a matter of law because she said that "perhaps" the injuries could have been the result of KS bathing. Kyriakos made it clear that she did not think that was a possibility.

prejudice under OEC 403.[12] Because the diagnosis also was relevant and valid scientific evidence, it follows that the trial court did not err in admitting it.

C.   *Admissibility of Evaluative Criteria Underlying the Diagnosis of Sexual Abuse.*

In his second assignment of error, defendant asserts that, even if Kyriakos's diagnosis that KS had been sexually abused was admissible, the trial court erred in rejecting his pretrial challenge to the KIDS Center evidence that explained the bases for that diagnosis because that evidence impermissibly commented on the credibility of KS. Before the trial court, defendant based his argument on the long-standing principle that a witness may not give an opinion on the truthfulness or credibility of another witness. *See, e.g.*, *Middleton*, 294 Or at 438; *State v. Milbradt*, 305 Or 621, 629, 756 P2d 620 (1988) (stating that assessment of credibility of witness is for trier of fact). At the pretrial hearing, defendant argued that testimony regarding the evaluative criteria used by Kyriakos and described in the KIDS Center report impermissibly commented on the credibility of KS because those criteria were "simply ways to determine whether the child is being deceptive or has been coached or has been contaminated." In defendant's view, the KIDS Center experts would be "telling the jury, in essence" that, "based on [the] use of the criteria *** [KS] is believable."[13] The only specific evidence that defendant challenged on that ground was the part of the DVD interview in which Glesne asked KS if anyone had told her what to say, and KS answered, "No." Defendant did not object—either at the

[12] We need not determine whether, on the record before us, the trial court would have erred if it had excluded the diagnosis under OEC 403. We reserve for another day the question whether, depending on a trial court's findings of case-specific preliminary issues of fact in a close case, this court would defer to the court's decision either to admit or exclude a diagnosis of child sexual abuse. *See State v. O'Key*, 321 Or 285, 320 n 45, 899 P2d 663 (1995) (expressing concern about lack of uniformity in trial court decisions concerning the admissibility of scientific evidence, particularly where "the preliminary facts are not case-specific").

[13] On review, the state asserts that defendant made a generalized pretrial objection to the KIDS Center report that is unavailing because much of the report was "clearly admissible." Because we understand defendant's objection to the report to have focused on the evaluative criteria that Kyriakos used in this case, we deem the objection to be sufficiently specific to address that issue.

pretrial hearing or at trial—to any other specific statements made by the KIDS Center experts in their testimony, in the KIDS Center report, or in the DVD of the interview of KS.

Defendant has further refined his argument on appeal based on this court's decisions in *Southard* and *Lupoli*. In *Southard*, this court was careful to point out that its decision "[did] not resolve[] whether any subsidiary principles that inform [the child sexual abuse] diagnosis are themselves admissible." *Southard*, 347 Or at 142. In *Lupoli*, the court took on that question. The expert witnesses in *Lupoli* explained that, in making a diagnosis of sexual abuse in the absence of physical evidence, they had evaluated the manner in which the child victim had reported the incident and whether the victim's disclosures had been "clear," "appropriate," "detail[ed]," "consistent," "developmentally appropriate," made in such a way that "you think that a kid is telling it like it is," and had not reflected risk factors such as "inappropriate sexual knowledge." *Lupoli*, 348 Or at 353-56. The defendant did not object to the diagnosis of sexual abuse itself. He did, however, object to testimony explaining the bases for the diagnosis on the ground that it amounted to improper vouching by the experts for the victim's credibility. *Id.* at 356.

Citing *Middleton*, this court agreed with the defendant. The court determined that, in the absence of physical evidence, such testimony necessarily is based on an assessment of the child's credibility. Because the testimony could not be meaningfully separated from that context, the court held that it was inadmissible. *Lupoli* at 362. The court also explained, however, that, "ordinarily," an expert witness may explain the basis for the expert's diagnosis, as long as the diagnosis itself is admissible. *Id.* at 361. The court further observed that the parts of the challenged expert testimony in *Lupoli* "might be admissible in many circumstances, and perhaps even in this case." *Id.* As examples, the court identified the expert's assessment of: (1) whether the particular victim's statements are developmentally appropriate; (2) the particular victim's demeanor and changes in demeanor; (3) the particular victim's disclosure as spontaneous and including descriptive details; and (4) the general circumstances that point to a child's suggestibility or the

possibility that the child has been coached. *Id*. Such assessments, the court explained, are "the kind of expert opinion that can assist a jury" and are not impermissible vouching on their own. *Id*.

On review, defendant focuses his argument on the trial testimony and report of Kyriakos, as well as the trial testimony of Glesne and Zancanella relating to certain attributes in a child's account that they are taught to look for, including spontaneous recall, consistency in core details, the use of sensory details, and the use of the child's body or a drawing in describing what happened. However, as noted, because defendant's only pertinent objections in this case were made in his motion *in limine* and related argument at the pretrial hearing, and defendant has assigned error to only the denial of that pretrial motion, our review is confined to the pretrial record. *See Pitt*, 352 Or at 574-75 (sufficiently developed pretrial objection is sufficient to preserve error in absence of an objection to trial testimony, but court evaluates issue based on record made before trial court when it issued order); *see also State v. Perry*, 347 Or 110, 116-17, 218 P3d 95 (2009) (noting focused inquiry on appeal when defendant did not object to discrete pieces of evidence during trial or assign error to any ruling occurring after jury was empanelled, but instead rested argument on trial court's ruling following pretrial hearing). Accordingly, we examine defendant's argument that the evaluative criteria that the KIDS Center uses generally and that Kyriakos used in making her diagnosis in this case amounted to impermissible comments on KS's credibility through the lens of his pretrial objections to evidence pertaining to those criteria.

As noted above, Kyriakos reached a diagnosis that was based on physical evidence and other evaluative criteria, but she did not directly testify that KS was credible. Instead, in her report and at the pretrial hearing, Kyriakos testified as to the criteria that bear on an evaluation of a child for sexual abuse—consistency of core details; information given in more than one media form; multiple, contextual, and in-depth details; spontaneity; and sensory details. In applying those criteria to KS's circumstances, Kyriakos testified that KS had been spontaneous and consistent in her disclosures, that she had used words, her body, and a

drawing to describe the abuse, and that she had been able to communicate sensory details. The issue is whether that opinion evidence impermissibly commented on KS's credibility.

A direct comment on the credibility of a witness or a statement that is "tantamount" to stating that another witness is truthful is not admissible, even if it is offered as part of a discussion of an admissible medical diagnosis. *See, e.g.*, *State v. Keller*, 315 Or 273, 285, 844 P2d 195 (1993) (expert testimony that there was no indication that witness had been "coached" was impermissible comment on credibility); *Milbradt*, 305 Or at 629-30 (an expert's opinion that a witness is not deceptive, could not lie without getting tripped up, and would not betray a friend is tantamount to expressing the opinion that the witness is telling the truth, and is not permissible). Because none of the KIDS Center evidence offered at the pretrial hearing involved a direct opinion that KS was truthful, the precise issue before us is whether any of that evidence nevertheless was "tantamount" to vouching for her credibility.

This court has not explained what is meant by a statement that is "tantamount" to stating that another witness is truthful, as the court identified in *Keller*. However, the statements that this court deemed improper in *Milbradt* and *Keller* provide helpful illustrations. Even though the experts in those cases did not expressly opine as to the truthfulness of the complaining witnesses, the challenged statements—that the witnesses had not been "coached" and were not "deceptive"—are commonly understood ways of signaling a declarant's belief that a witness is telling the truth. To be sure, stating that a person has not been coached or is not deceptive is tantamount to, the equivalent of, and the same as stating that the person is truthful.

*Middleton* furnishes a contrasting example. In that case, the complaining witness, a 14-year old girl, initially reported that her father had raped her. Two months later, she claimed that she had lied about the rape so that she could move out of her parents' house. At trial, however, she testified that the rape did occur as originally reported. The trial court admitted testimony from two social workers who had interviewed the child and who testified as to "the

behavior of the type of children who have reported a claim of rape by a family member and whether the [complaining witness's] behavior was consistent with what [was] described as typical behavior." *Middleton*, 294 Or at 433. That testimony included statements that the expert "found [the victim's] behavior very much in keeping with children who have complained of sex molestation at home," *id.* at 432 n 5, and that the victim's behavior of retracting a report was "a very common kind of thing to happen *** [and] very typical for a teenage sex abuse victim," *id.* at 433-34 n 6.

The significance of the recantation as an indice of the complaining witness's credibility was hotly contested in *Middleton*. The challenged testimony in that case was relevant to show that what appeared to be unusual behavior for a victim of sexual abuse was not, in fact, all that unusual. That is, the testimony explained that the victim's recantation was not uncommon. The fact that the jury might further infer from that testimony that the particular complainant in that case had been truthful about the abuse did not render the testimony inadmissible. *Id.* at 435. As the court observed:

> "It is true that if the jurors believed the experts' testimony, they would be more likely to believe the victim's account. Neither of the experts directly expressed an opinion on the truth of the victim's testimony. Much expert testimony will tend to show that another witness either is or is not telling the truth. This, by itself, will not render evidence inadmissible."

*Id.* (citation omitted). In *Middleton*, the suggestion in the expert's statement that the complaining witness was telling the truth was more remote than the inferences in *Milbradt* and *Keller*; when the expert in *Middleton* informed the jury that victim recantation is not unusual, the primary effect of the statement was to show that recantation does not necessarily mean that a complainant is untruthful, which is not tantamount to, the equivalent of, or the same as stating that the particular complainant in that case was telling the truth. *See also Perry*, 347 Or at 118-19, 126 (holding evidence that some children who have been abused may delay disclosing abuse admissible, when presented to disprove claim that delay in reporting demonstrates that no abuse occurred).

    Admittedly, it is not always easy to draw the line between an inadmissible statement that is tantamount to a direct comment on the credibility of a witness and an admissible statement that is relevant for a different reason but that tends to show that a witness is telling the truth. However, that difference is not all that distinguishes *Middleton* from *Milbradt* and *Keller*. As important was the fact that this court deemed the recantation in *Middleton* to be sufficiently beyond the ordinary experience of a lay finder of fact such that expert testimony would "explain[] *** superficially bizarre behavior by identifying its emotional antecedents." *Middleton*, 294 Or at 436; *see also id.* at 437 (testimony was admissible because it would help jury "make a more informed decision in evaluating the credibility of a testifying child"). No similar assistance was provided either in *Milbradt* or *Keller*, where this court implicitly decided that the credibility determination was not sufficiently complex to conclude that expert testimony would assist, rather than impermissibly influence, the jury in making its own assessment.

    In short, our prior decisions stand for the proposition that, to be admissible, expert testimony must assist—not undermine—the jury's own assessment of witness credibility. Expert testimony that provides jurors with useful information in making their own credibility assessment ordinarily is admissible, as long as it is not either a direct comment on the credibility of a witness or tantamount to a direct comment on the credibility of a witness.[14] Consistently

---

[14] We reiterate that, even where a credibility determination involves complex factual components, there are other legal limits on the admissibility of expert testimony bearing on that determination. In *State v. Hansen*, 304 Or 169, 176, 743 P2d 157 (1987), also a child sex-abuse case, this court held that expert testimony offered to explain a child's denial of the alleged abuse could not include testimony regarding the "grooming" techniques used by child abusers. The court explained that testimony pertaining to the typical responses of sexually abused children,

  "arguably is admissible *** because it might assist the trier of fact to understand the student's initial denial. But the specific techniques used by some child abusers 'to get close to the victim,' which may result in the child's emotional dependence on the abuser, are irrelevant to the effect the dependence has on the child's willingness to implicate the abuser. It is the emotional dependence, not the specific acts that produce it, that helps to explain the child's behavior."

*Id.* at 175-76. In *State v. Stevens*, 328 Or 116, 970 P2d 215 (1998), the court elaborated on its reasoning in *Hansen*:

with that principle, this court stated in *Lupoli* that an expert witness ordinarily can describe the subsidiary principles—that is, the evaluative criteria—underlying an admissible diagnosis of child sexual abuse. *Lupoli*, 348 Or at 361. Those criteria include the general characteristics that the expert looks for in examining a child for sexual abuse and necessarily include characteristics that permit the expert to assess the validity of the allegation. *See id.* at 362.

Because this court in *Lupoli* concluded that, in the absence of a diagnosis supported by physical evidence, the challenged evidence in that case constituted impermissible vouching, the court's discussion of the admissibility of evidence pertaining to the evaluative criteria underlying an admissible diagnosis of sexual abuse was not, strictly speaking, necessary to its decision. However, as the Court of Appeals noted, *Lupoli* "strongly suggests" that, when a diagnosis of sexual abuse is admissible because it is adequately supported by physical evidence, "expert opinion is not 'ultimately and only' based on credibility, [*Lupoli*, 348 Or at 362], and those types of assessments that are offered in support of a diagnosis and that do not constitute [impermissible] 'vouching' are 'ordinarily' admissible—that is, they are admissible" if the underlying diagnosis of sexual abuse is itself admissible. *Beauvais*, 261 Or App at 847. We now endorse that "strong" suggestion, and so hold. When a medical diagnosis of child sexual abuse is adequately supported by physical evidence of abuse and is otherwise admissible, short of a direct comment or a statement that is tantamount to stating that the child is telling the truth, the expert's testimony concerning the diagnosis ordinarily can include a description of the evaluative criteria underlying the diagnosis and the characteristics of the child that led to the diagnosis. *See Lupoli*, 348 Or at 362.

"Although *Hansen* indicates that testimony that describes the process of victimization may be inadmissible in some circumstances, either because it is irrelevant or unduly prejudicial, that case does not hold that such testimony is, in all circumstances, inadmissible. *Hansen* involved the testimony of an expert who purported to explain the seemingly abnormal responses of a certain class of victims to a particular type of criminal behavior. In general, such experts can and must do so without providing details of the victimization process: Those details are irrelevant to the expert's subject matter and, as such, rarely will pass the balancing test of OEC 403."

*Stevens*, 328 Or at 127.

As applicable here, an expert's description of a witness's "spontaneous and descriptive details in her statements" is permissible. *Id.* Similarly, generally speaking, testimony that a witness's statements were consistent with earlier statements that the witness made does not impermissibly vouch for the witness's credibility. *State v. Viranond*, 346 Or 451, 461, 212 P3d 1252 (2009). In combination, *Lupoli* and *Viranond* support the admission in this case of Kyriakos's testimony about the following evaluative criteria: consistency of core details; information given in more than one media form; multiple, contextual, and in-depth details; and spontaneity. Only one of the evaluative criteria that defendant challenges has not been at least implicitly approved in this court's previous decisions, namely, evidence of an expert's reliance on a witness's ability to describe sensory details. We also conclude, however, that Kyriakos's discussion of that criterion did not cross the line in this case. Unlike the impermissible vouching in *Milbradt* and *Keller*, Kyriakos's testimony about the sensory details contained in KS's statements was not a direct comment on KS's credibility, nor was it tantamount to stating that KS was telling the truth. Instead, it showed that KS previously had experienced a stinging sensation and therefore knew how to describe it. That information was helpful to the jury in making its own assessment of KS's credibility.

In sum, Kyriakos's testimony about the evaluative criteria that she used in reaching her admissible diagnosis of sexual abuse did not constitute impermissible vouching, but, rather, assisted the jury in making their own assessment of KS's complaint. Accordingly, the trial court did not err in rejecting defendant's pretrial challenge to the portions of Kyriakos's testimony and the KIDS Center report in which she discussed those evaluative criteria and their application to KS's evaluation.

With regard to the sole objection that defendant made to specific evidence at the pretrial hearing, we conclude that asking KS whether anyone told her what to say during her interview at the KIDS Center, followed by her negative answer to that question, was not an impermissible comment on KS's credibility. Although an expert's statement that "[t]here was no evidence of leading or coaching"

is impermissible vouching, because it "amounts to testimony that the child was credible," *Keller*, 315 Or at 285, that is not what happened here. When the interviewer asked KS whether anyone had told her what to say during her interview at the KIDS Center, the interviewer was attempting to determine whether KS had been coached. The interviewer did not state—nor did she imply—whether she believed that KS had been coached or whether she believed that KS was telling the truth. Ordinarily, general descriptions of "the circumstances that can point to a child's suggestibility or the possibility that the child has been coached" are the types of expert opinions that would assist the jury and are not impermissible vouching. *Lupoli*, 348 Or at 362. Unlike the expert's statement in *Keller*, the exchange between the interviewer and KS was not a comment on KS's credibility; rather, it presented a basis for the jury to determine for itself whether KS had been coached. Accordingly, the trial court did not err in admitting that evidence.

### III.   CONCLUSION

To reiterate, there is sufficient physical evidence of abuse so that a medical diagnosis of sexual abuse ordinarily is admissible under OEC 403 if (1) physical evidence meaningfully corroborates the alleged type of abuse; (2) the expert significantly relies on that physical evidence in making the diagnosis of sexual abuse; and (3) the causal relationship between the physical evidence and the diagnosis is sufficiently complex such that a lay trier of fact cannot assess the connection as well as an expert. When those factors are present, the diagnosis tells the jury something that it could not determine as well on its own; thus, the probative value of the diagnosis ordinarily will not be substantially outweighed by the danger of unfair prejudice. In this case, because those factors were present, the trial court did not err in admitting the diagnosis.

Insofar as defendant's second assignment of error is concerned, the trial court did not err in denying defendant's motion *in limine* to generally exclude the KIDS Center evidence that explained the evaluative criteria for the diagnosis of sexual abuse on the ground that the evidence impermissibly commented on the credibility of the complaining

witness. Nor did the court err in rejecting defendant's sole specific pretrial challenge on that ground to a part of that evidence.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.