Argued and submitted September 27, 2022, affirmed February 8, petition for review denied June 15, 2023 (371 Or 175)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SEBASTIAN S. MEIGHAN,
*Defendant-Appellant.*

Washington County Circuit Court
19CR35408; A173611

525 P3d 78

Defendant appeals a judgment of conviction for multiple counts of felony sexual offenses. He assigns error to the trial court's jury instructions on unanimity, the court's admission of a doctor's diagnosis of chronic child sexual abuse, and the proportionality of defendant's ultimate sentence. *Held*: First, the Court of Appeals concluded that the trial court committed legal error when it instructed the jury that it could return nonunanimous verdicts and when it failed to instruct the jury that it had to reach a unanimous concurrence on the factual incidents underlying the charges. However, both errors were harmless. In addition, in light of *State v. Beauvais*, 357 Or 524, 354 P3d 680 (2015), the trial court did not err in admitting the diagnosis of chronic child sexual abuse. Finally, the court rejected defendant's challenge to his sentence as unconstitutionally disproportionate.

Affirmed.

Janelle F. Wipper, Judge.

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and James, Judge pro tempore.

JOYCE, J.

Affirmed.

Aoyagi, P. J., concurring.

**JOYCE, J.**

Defendant appeals a judgment of conviction for two counts of first-degree rape, one count of second-degree rape, and four counts of first-degree sexual abuse. His convictions stem from his abuse of his niece, D, beginning when she was about five and continuing until she was about 14 years old. On appeal, he challenges the trial court's jury instructions, the court's admission of a diagnosis of chronic child sexual abuse, and his ultimate sentence. We reject defendant's challenge to his sentence without discussion. We otherwise affirm.

## I.   UNANIMOUS JURY INSTRUCTIONS

Defendant raises two separate challenges to the trial court's jury instructions on unanimity. First, defendant argues, and the state concedes, that the trial court erred in failing to instruct the jury that it had to reach a unanimous verdict to find defendant guilty. We agree that the trial court erred in light of *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 1394, 1397, 206 L Ed 2d 583 (2020), which was decided after defendant's trial. However, the jury unanimously found defendant guilty on all counts, as evidenced by the fact that each juror signed each verdict form. We thus conclude that the instructional error was harmless. *See State v. Kincheloe*, 367 Or 335, 339, 478 P3d 507 (2020), *cert den*, ___ US ___, 141 S Ct 2837, 210 L Ed 2d 951 (2021).

Second, defendant argues that the trial court erred in denying his proposed instruction that the jury had to reach a unanimous concurrence on the factual incidents underlying the charges. Instead, the trial court instructed the jury that "ten jurors voting guilty must agree on what factual occurrence constituted the crime. Thus, in order to reach a guilty verdict on any count, at least ten jurors must agree on what factual occurrence constituted the offense." Defendant argues that, in light of *Ramos*, that instruction was error. The state concedes as much, *see State v. Stowell*, 304 Or App 1, 5 n 1, 466 P3d 1099 (2020), *abrogated in part on other grounds by State v. Shedrick*, 370 Or 255, 269, 518 P3d 559 (2022) (unanimous jury concurrence required), but

argues that the error was harmless.[1] We agree with the state.

To understand why the instruction was harmless, a detailed description of the facts (particularly with respect to where and when the abuse took place) is necessary. At the time of the trial in 2020, D was 14 years old. Defendant, who is D's uncle, lived with D and her family at various times from 2007 through 2018. From 2006 to 2011, when D was one until she was approximately five, D's family lived at a yellow house. In 2011, D's family moved to a three-bedroom apartment, followed by a second move into a larger, four-bedroom apartment in the same complex in 2014, when D was approximately eight. In both apartments, D had her own room for a time and shared a room with her brother for a time; defendant, when he lived with them, had a separate room.

In 2019, D disclosed to her friends that defendant had raped her. Shortly after her disclosures, D underwent an interview and physical examination at Child Abuse Response and Evaluation Services (CARES). We describe the ultimate outcome of that examination later in relation to defendant's challenge to the diagnosis of chronic child sexual abuse and, for now, confine our discussion to D's statements of abuse during the interview and examination. D said that defendant first abused her when she was four or five years old; while she was living at the yellow house, defendant touched her breasts with his hands. D said that defendant also touched her breasts in the first apartment and touched her breasts and vagina over her clothing in two of the bedrooms in the second apartment. On another occasion in the second apartment, defendant made her touch his penis with her hand in her bedroom.

D also disclosed that, while living in the second apartment, defendant came into her room at night, when she was asleep, and she woke up with defendant on top of

---

[1] In its answering brief, the state did not develop any argument—beyond its answer to the assignment of error—explaining why it viewed the error as harmless (although the state more fully explained why the error was harmless at oral argument). We nonetheless have an independent obligation to assess whether an error is harmless. *State v. Sperou*, 365 Or 121, 140, 442 P3d 581 (2019).

her. She tried to push him away and told him to stop. During that incident, defendant penetrated her vagina with his penis. D reported that this was the first time that defendant had raped her. In her CARES interview, D thought that it had occurred in late summer 2018 when she was nine or 10. She recalled that she and her family (including her mother's partner and his family) went to a lake the next day. After that assault, D's vaginal area hurt and she described it as being red, like she had a rash. D also disclosed a second rape that occurred in defendant's room of the second apartment. During that assault, defendant grabbed her wrist and it hurt.

After D's interview with CARES, the investigating detective, Anderson, spoke with D to clarify the timing of the first rape. Anderson was confused by D's recollection that the first rape occurred in the summer of 2018. When he had talked with D initially, she had disclosed that the first rape occurred when she was nine or 10. But if D had been nine or 10 the first time that defendant raped her, that would have placed the first rape in 2014 or 2015, not 2018 as D had indicated during the CARES interview. In 2018, D would have been approximately 13. D's mother confirmed to Anderson that D had told her that she got mixed up on dates and that the lake trip that she was referring to was in 2014, when she would have been nine or 10 years old.

The state charged defendant with a number of sex offenses.[2] More particularly, the state charged defendant with two counts of first-degree rape, one alleged to have occurred by means of forcible compulsion when D was under the age of 14 (Count 1),[3] *see* ORS 163.375(1)(a), and the other alleged to have occurred when D was under the age of 12 (Count 6), *see* ORS 163.375(1)(b). The state also charged defendant with four counts of first-degree sexual abuse for conduct alleged to have occurred on or about June 29, 2018:

---

[2] The state charged defendant with an additional first-degree rape (*former* Count 3) but ultimately dismissed that charge. Additionally, the court granted defendant's motion for judgment of acquittal on a charge of luring a minor (*former* Count 7). The court, in instructions to the jury, then renumbered the counts. We refer to the remaining counts as renumbered to avoid confusion.

[3] The state also charged defendant with the lesser included offense of second-degree rape for the same incident (Count 2).

one count for touching D's vaginal area when she was under the age of 14 (Count 3), one count of touching D's breasts when she was under the age of 14 (Count 4), and one count of subjecting D to sexual contact with defendant's penis when she was under the age of 14 (Count 5). ORS 163.427(a)(A). The state alleged that Count 7—touching D's breasts when she was under the age of 14—took place before the other three counts, on or between July 31, 2008, and September 2, 2011 (Count 7).

At trial, D very briefly testified about the abuse. She described that defendant had touched her breasts when she was living in the yellow house when she was four or five. She also described two incidents of rape, both of which occurred in the second apartment. She testified that before the lake trip, defendant came into the room where she was, forcefully removed her pants and underwear before removing his own, and "put his private in my private." She could not remember what room she was in during that rape. She then testified to another rape in which defendant penetrated her vagina with his penis.[4]

D's mother also testified at trial. She explained that D told her that defendant had first raped her the night before a lake trip that the family took with the family of D's mother's partner, when D was nine. That trip, according to D's mother, occurred in 2014. The family took another lake trip in 2018, but it did not include her partner's family. She also testified that D told her some of the abuse occurred when she was in the seventh grade.

Defendant denied each of the allegations against him and, during closing arguments, attacked what he perceived to be inconsistencies in D's dates and descriptions of the events.

For its part, the state argued during closing arguments that Count 1, first-degree rape by forcible compulsion, was based on the incident where defendant raped D and held down her wrists. In contrast, Count 6, first-degree rape when D was under the age of 12, was based on the rape that occurred the night before the lake trip. The state

---

[4] The state also played the CARES interview during trial.

emphasized that the rape charged in Count 6 was the first time that defendant had raped D, followed by the second rape involving forcible compulsion.[5]

At the close of evidence, in addition to the "10 of 12" concurrence instruction, the trial court gave the jury several other instructions relevant to this claim of error. The court instructed the jury that it had to find, as an element of the offense of first-degree rape as alleged in Count 1, that defendant knowingly had sexual intercourse with D by means of forcible compulsion. In contrast, the court instructed the jury that to find defendant guilty of first-degree rape as alleged in Count 6, it had to find that defendant knowingly had sexual intercourse with D when she was under the age of 12. The court also instructed the jury that, although the state did not have to prove that the charged crime occurred on a particular date, the jury did have to find that the crimes occurred "on or about the date[s] alleged" in the indictment. The jury unanimously found defendant guilty on each count, as reflected in the verdict forms.

However, as defendant points out on appeal, the verdict forms do not reflect whether each juror agreed on the factual occurrence underlying each conviction. He thus asserts that the court's failure to give a factual concurrence instruction was harmful error. We conclude that, in light of the victim's testimony and the jury instructions, the error was harmless beyond a reasonable doubt. *State v. Scott*, 309 Or App 615, 620-21, 483 P3d 701 (2021) (in the context of a nonunanimous jury instruction, the state has the burden to demonstrate that error was harmless beyond a reasonable doubt).

An error is harmless beyond a reasonable doubt if "the reviewing court is satisfied beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Flores Ramos*, 367 Or 292, 320, 478

---

[5] Throughout the trial, the state referred to the forcible compulsion rape as having occurred when D was in the seventh grade. That characterization is apparently consistent with what D stated during her CARES evaluation. The transcription of that evaluation is largely "inaudible" and, admittedly, parts of the evaluation are difficult to hear because D was soft spoken. But the indictment charged that act as having occurred in June 2018, when D would have been 13 and in the seventh grade.

P3d 515 (2020) (internal citation omitted). Conversely, the failure to give a proper jury concurrence instruction is not harmless when "jurors could have based their verdicts on different occurrences." *State v. Teagues*, 281 Or App 182, 194, 383 P3d 320 (2016); *see also Mellerio v. Nooth*, 279 Or App 419, 436, 379 P3d 560 (2016), *rev den*, 361 Or 803 (2017) (the error is not harmless if the evidence could lead a jury to base their verdicts on different factual occurrences, resulting in a "mix-and-match verdict"). In answering the question whether the error is harmless, we consider the record as a whole. *State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006).

We conclude that the failure to give a unanimous jury concurrence instruction in this case was harmless. At oral argument, defendant conceded that it was unlikely that the error was harmful with respect to Count 7—first-degree sexual abuse for touching D's breasts at the yellow house when she was under the age of 14—and we agree. For that count, the state alleged that defendant touched D's breasts between 2008 and 2011. D testified to only one instance where defendant touched her breasts between 2008 and 2011—in the yellow house when she was four or five. That age also corresponds to when D and her family lived in the yellow house, from 2006 to 2011. Under the circumstances, it is unlikely that the jury would have been confused about the events underlying that charge.

The same holds true for the rape charges (Counts 1 and 6). In defendant's view, the inconsistencies in D's statements about when the first rape occurred (2014 versus 2018) created the risk of a "mix-and-match" verdict. However, the evidence and the jury instructions demonstrate that such a risk did not exist. As described above, the state charged defendant with two counts of first-degree rape based on D's statements that defendant had raped her twice; however, only one count (Count 6) required the jury to find that D was under the age of 12. D testified to only one rape that could have happened when she was under the age of 12: the 2014 assault that occurred the day before the lake trip. To be sure, D told the CARES interviewer that the first rape happened in 2018, which—if true—would mean that the first rape had occurred when D was over the age of 12. D then testified at trial that she had been confused about the date and that

the first rape had happened in 2014, when she would have been under the age of 12. By unanimously finding defendant guilty of Count 6, the jury necessarily agreed to the underlying factual circumstance of that crime, namely, that the first rape occurred in 2014, when D was under the age of 12. And, because D only described one other rape, the second one that involved forcible compulsion, there is little risk that the jury was confused about the conduct constituting the other rape, Count 1.[6] Indeed, the jury unanimously found that defendant had engaged in forcible compulsion during that rape. Further, our conclusion is buttressed by the state's framing of the two rapes: It made clear to the jury that Count 1 was charged based on the rape involving forcible compulsion (the holding of D's wrists) and that Count 6 was based on the rape that occurred before the lake trip in 2014.

We reach the same conclusion with respect to the remaining charges. With respect to Count 5—subjecting D to sexual contact with defendant's penis when she was under the age of 14—D only described a single incident of defendant forcing her to touch his penis; thus, it was unlikely that the jury would have been confused or disagreed as to the factual occurrence underlying that charge.

Finally, we conclude that the error is harmless with respect to the two other sexual abuse charges related to defendant touching the victim's breasts and vaginal area in the second apartment when she was under the age of 14 (Counts 3 and 4). The only evidence as to those crimes was D's statements that defendant touched her breasts and vaginal area in two of the three rooms in the second apartment and that he also touched her breasts in the first apartment. She identified the conduct "only generally" and her testimony was "nonspecific and undifferentiated." *State v. Ashkins*, 357 Or 642, 662, 357 P3d 490 (2015) (error held harmless where

_____

[6] We appreciate that our reasoning for why the error in giving a proper jury concurrence instruction is harmless echoes, in some ways, the analysis for determining whether a jury factual concurrence instruction is necessary in the first instance. Stated differently, it may be that some of the charges at issue here did not require a concurrence instruction. However, both parties below agreed that an instruction was needed for all charges—they simply disagreed over the number required for concurrence—and no party on appeal has suggested that concurrence instructions were not required for some of the charges. Accordingly, we confine our analysis to whether any error was harmless.

the victim's testimony was "primarily nonspecific and undifferentiated; although she identified some occurrences at particular locations, most of the occurrences were described only generally, and without reference to a time frame"); *see also State v. Camphouse*, 313 Or App 109, 491 P3d 94, *adh'd to as modified on recons*, 316 Or App 278, 501 P3d 103 (2021), *rev den*, 369 Or 675 (2022).[7] And defendant did not dispute particular instances of that conduct; rather, he denied that they happened at all and focused on attacking the perceived inconsistencies in D's statements. *Ashkins*, 357 Or at 662-63 (error held harmless where the defendant denied that any of the alleged incidents of abuse had occurred and focused on inconsistencies in the victim's statements as well as the lack of direct evidence to support the charges); *see also State v. Theriault*, 300 Or App 243, 256, 452 P3d 1051 (2019) (recognizing that a "sweeping denial" is more likely to make error in failing to give a concurrence instruction harmless than a defense theory that is particularized to challenging specific incidents). Viewing the record as a whole, we conclude that nothing indicates that the jury, in evaluating the evidence to determine if defendant had committed those offenses, would have reached one conclusion as to some of the occurrences but a different conclusion as to others.

We therefore conclude that the trial court's error in not giving a jury concurrence instruction was harmless error.

## II.   DIAGNOSIS OF CHILD SEXUAL ABUSE

We now turn to defendant's challenge to the diagnosis of child sexual abuse. After a medical doctor, Dr. Grigsby, examined D at CARES, she diagnosed D with chronic child sexual abuse. As he did below, defendant argues that the

---

[7] We recognize that the harmless error analysis in both *Ashkins* and *Camphouse* involved the state constitutional harmless error standard, *i.e.*, whether there was little likelihood of the error affecting the verdict. We nonetheless find the considerations discussed in those cases informative in determining whether the state met its burden under the federal harmless error standard. *See Ashkins*, 357 Or at 660 n 15 (declining to consider the defendant's argument that the failure to give the jury concurrence instruction also constituted harmless error under the federal standard, because the defendant had not argued that there was a difference between the state and federal constitutional standards that was "meaningful to the harmless error analysis in this case").

diagnosis fails to satisfy the test for admissibility set forth in *State v. Beauvais*, 357 Or 524, 354 P3d 680 (2015). We review for errors of law. *Id.* at 534-40 (applying standard). Additionally, because defendant renewed his objection to the admission of the diagnosis at trial, we consider D's testimony at both the pretrial hearing as well as during trial. *Cf. Beauvais*, 357 Or at 546 (explaining that because the defendant only challenged the denial of the pre-trial motion *in limine* and did not object to the challenged testimony at trial, the scope of review was limited to the record on the motion *in limine*). Because we conclude that the trial court correctly admitted the diagnosis, we affirm.

A. *Factual Background*

Grigsby evaluated D based on a "concern for child sexual abuse that had been chronic," *i.e.*, abuse that was ongoing or had been more than a one-time assault. Grigbsy reviewed D's medical history and notes from an interview with D's mother and performed a physical examination of D.

D's mother told Grigsby that D had started wetting the bed around age 10, in 2015, despite having been toilet trained. D's mother had D wear diapers to bed. Around the same time, D started complaining about painful urination "in that same context of bedwetting." D's mother also described that D was experiencing sadness, was having anxiety attacks, and was "acting depressed" around the same time that she started wetting the bed.

Grigsby's review of D's medical history revealed that D had received medical care on three separate occasions for urinary tract infections, vaginal pain, and painful urination in October 2015, January 2016, and January 2017. Grigsby noted that the medical records showed that D was wetting the bed around that same time, starting when she was about 9.

Grigsby's physical exam revealed an area of hyperpigmentation—or an area of skin that was darker than the surrounding area—at the base of D's right labia. The skin also appeared thinner than the surrounding skin. Additionally, D had bacteria in her urine at time of the medical evaluation.

At trial, Grigsby described at length the significance of her findings and how they led to her diagnosis of chronic child sexual abuse. Grigsby testified that urinary tract infections can be a "consequence or as a sequela of some sort of sexual contact." More particularly, they can be caused by sexual activity because bacteria transfers from the person with whom the victim is having sex. Urinary tract infections can be chronic and sometimes go away on their own. Additionally, those infections can go undiagnosed, especially in children; many times, children have bacteria in their urine for some time before complaining about it. Grigsby was unable to say how long D had had the urinary tract infections, because it was possible that she simply had not sought treatment. Grigsby noted that D's mother had told Grigsby that D had complained about vaginal pain but it "didn't always result in going to the doctor."

Grigsby testified that pain with urination is a significant symptom because when a "child void[s] after sexual contact in those areas, they can actually have pain and burning." The sexual contact can create a micro-trauma, or an inflammation of areas of the vagina and around the urethra, which can cause pain with urination. Grigsby also noted that bedwetting after having been toilet trained can reflect stress in the child's environment "or something significant could have happened in the family." Grigsby acknowledged that the painful urination and bedwetting can have causes other than sexual abuse but that they were "concerning as a whole" in corroborating a potential sexual trauma, "especially if there's a disclosure from the child."

Grigsby also explained the significance of the hyperpigmentation that she observed on D's labia. She described the finding as "non-specific, but something you don't typically see in an exam of a child," which caused Grigsby to categorize the finding as "abnormal."[8] Hyperpigmentation

---

[8] Grigsby explained that a "non-specific finding" is one that is not diagnostic but is "something that I can't ignore." A diagnostic finding is "very weighty things that even without a child's disclosure," Grigsby would have to call DHS or law enforcement. Examples include a pregnant minor, lab results that contain semen, or a complete transection of the hymen. Grigsby, who has been doing these kinds of exams since 2014, has seen a diagnostic finding in less than 25 of her cases. The majority are "normal and then there are occasionally children like [D] that have a finding that it's not normal."

is most commonly caused by "post-inflammat[ion]" and it suggests healing from an injury. Thus, it can be the result of a penetrative injury. Hyperpigmentation can have other causes—many people of color have hyperpigmentation.[9] Commonly, that hyperpigmentation presents as symmetrical, but in D, the hyperpigmentation occurred in just one small area. Thus, it was different than what Grigsby generally sees in people of color. Grigsby did not see anything in D's history that would have explained the finding, such as an accidental or straddle injury. Grigsby explained that she interpreted the hyperpigmentation in the context of D's disclosures of abuse.

Grigsby also observed that the skin around the spot of hyperpigmentation was thinner and that it was "definitely abnormal from the remaining skin[.]" That finding, while again nonspecific, was a finding that made her concerned that there had been a prior injury there.

That constellation of observations led Grigsby to diagnose D as suffering from chronic child sexual abuse: "[W]ith a reasonable degree of medical certainty, that was my diagnosis, based on all that information" that she had received. The physical exam that revealed the hyperpigmentation and D's history of bed-wetting, painful urination, and vaginal pain were "all significant factors for [Grigsby's] diagnostic opinion." Not only were they significant factors, but the physical evidence corroborated the type of abuse that D described, because "it was consistent with penile-vaginal penetration." Grigsby noted that there was nothing in D's history that would have "collectively" explained all of her symptoms. Grigsby also noted that D's sleep difficulties, intrusive thoughts, nightmares, and suicidal ideation were "consistent with the other kind of constellation of symptoms" that she observed: "I did rely on all that information to come to that conclusion." Although each of the symptoms can be associated with something other than sexual trauma, "they were concerning as a whole to [Grigsby]," corroborating a potential sexual trauma. That held particularly true in light of D's disclosures of abuse.

---

[9] D is a child of color.

Both pretrial and during trial, defendant objected to the admission of Grigsby's diagnosis. Defendant argued that the diagnosis failed the test set forth in *Beauvais* because the physical evidence did not corroborate the diagnosis. The trial court concluded that, based on *Beauvais*, the diagnosis was admissible. It focused its ruling on D's urinary tract infections, pain with urination, increased sadness, bedwetting, and hyperpigmentation. The court concluded that the physical evidence corroborated Grigsby's diagnosis, the doctor relied on the evidence in making her diagnosis, and the diagnosis was not itself unfairly prejudicial to defendant. Defendant now appeals from that ruling.

B.   *Analysis*

The parties agree that the analytical framework that we use to determine the admissibility of Grigsby's diagnosis is largely guided by *Beauvais*, so we begin there. Or, perhaps more accurately stated, we start with *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), the case that presaged the outcome in *Beauvais*. In *Southard*, the court considered whether a diagnosis of child sexual abuse, in the absence of any corroborating physical evidence, was admissible. *Id.* at 142. The court concluded that the diagnosis was relevant under OEC 401 and that the diagnosis was scientifically valid and thus admissible under OEC 702. *Id.* at 138-39. But the court also concluded that, in the absence of corroborating physical evidence, the diagnosis was inadmissible under OEC 403 because the probative value was substantially outweighed by the danger of unfair prejudice. *Id.* at 141. The court explained that the diagnosis's probative value was low because it did not tell the jury anything that it could not determine on its own. *Id.* at 140. In contrast, the court found that the danger of unfair prejudice was high, because the diagnosis—based primarily on the assessment of the victim's credibility—posed the risk that the jury would not make its own credibility determination, instead deferring to the expert's "implicit conclusion that the victim's reports of abuse are credible." *Id.* at 140-41.

In *Beauvais*, the court began by noting that the case presented a question that *Southard* foreshadowed but did not answer: whether a diagnosis of child sexual abuse is

admissible under OEC 403 when physical evidence of abuse is present. 357 Or at 534. In *Beauvais*, the victim alleged that the defendant had touched her vaginal area. *Id.* at 526. A sexual assault nurse examined the victim and found redness, swelling, and abrasions on the victim's vaginal area. *Id.* at 526-27. The nurse referred the victim to the Kids Intervention and Diagnosis Service Center (KIDS Center) for a follow-up evaluation. *Id.* at 527. There, a doctor performed a physical examination and diagnosed the victim as having been sexually abused. *Id.* She did so based on the nurse's findings and the victim's history as gathered from the victim and caregivers, among others. *Id.* at 528. As to the physical findings made by the nurse, the doctor could not find an alternate explanation other than sexual abuse. *Id.* at 529. The doctor also testified that the victim's "core details" were consistent as she described them to various parties and that the victim provided multiple details about the assault. *Id.* The doctor further testified that behavioral changes that the victim had experienced since the assault—a change in appetite, not wanting to sleep by herself, sadness, and withdrawal—were relevant to her evaluation. *Id.* at 530. "Based on her overall evaluation, [the doctor] testified that she had concluded to a reasonable degree of medical certainty that [the victim] had been sexually abused." *Id.*

On those facts, the court turned to the question presented, *viz.*, whether a diagnosis of child sexual abuse accompanied by physical findings compels a different result than *Southard*. *Id.* at 534. It began by rejecting the idea that the presence of physical evidence will always render a diagnosis of sexual abuse admissible. *Id.* at 536. Rather, whether such evidence is admissible depends on the extent to which the diagnosis "tells the jury something that it could not determine as well on its own and the risk that the trier of fact will improperly defer to what it reasonably could perceive to be a credibility-based evaluation by the expert." *Id.* at 537. Instead, the physical evidence "must have more than a speculative or insubstantial connection to the diagnosis; that is, the evidence must meaningfully corroborate the diagnosis." *Id.* Moreover, the expert must "significantly rely" on the physical evidence in making the diagnosis to ensure that the evidence "is neither incidental nor tangential to the

diagnosis." *Id.* at 537-38. Finally, the diagnosis must involve a complex factual determination "'that a lay person cannot make as well as an expert.'" *Id.* at 538 (citing *Southard*, 347 Or at 140). When those foundational requirements are met, the "probative force of the diagnosis is more likely to derive from the strength of the causal connection between the physical findings and the diagnosis rather than from the expert's assessment of the child's credibility." *Id.*

Applying that test, the court in *Beauvais* concluded that the diagnosis was admissible. *Id.* at 540. The victim reported that the defendant had touched her vaginal area, and the examination report described redness, swelling, and abrasions for which the doctor could discern no other cause. *Id.* at 538-39. The doctor testified that she had considered the physical findings in reaching her diagnosis. *Id.* at 539. And finally, the court concluded that the testimony about the significance of the physical evidence involved application of specialized medical knowledge to diagnostic facts, which are not criteria that lay jurors are expected to use. *Id.*

Here, defendant argues that two of those three *Beauvais* foundational requirements are not satisfied: In defendant's view, the physical evidence does not meaningfully corroborate the abuse and Grigsby did not "significantly" rely on the physical evidence in making the diagnosis. Defendant addresses two pieces of physical evidence—the hyperpigmentation and the urinary tract infections—and argues that each, standing alone, fails those two *Beauvais* elements.

A threshold difficulty with defendant's argument is that Grigsby repeatedly testified that it was the constellation of physical evidence that led to her diagnosis of chronic child sexual abuse. Framed slightly differently, Grigsby did not testify, for instance, that urinary tract infections alone or the hyperpigmentation alone would have led her to diagnose D with chronic child sexual abuse. Rather, she testified no fewer than four times that her diagnosis was based on "all th[e] information" that she received, that she viewed the physical evidence "collectively," and that the evidence was "concerning as a whole[.]"

We thus consider, as Grigsby did, whether the constellation of physical evidence that Grigsby observed (or learned about from D's medical history) meaningfully corroborated the abuse and whether Grigsby significantly relied on it. Taking that second question first, our discussion above largely disposes of defendant's argument. We understand the "significantly rely" requirement of *Beauvais* to protect against the risk that the expert simply relied on the victim's statements, rather than on the physical evidence, in reaching the diagnosis, a risk that in turn creates the potential that the jury will simply defer to a credibility-based evaluation by the expert. To meet that requirement, the evidence must be more than "incidental" or "tangential" to the diagnosis. *Beauvais*, 357 Or at 538. Here, Grigsby was clear throughout her testimony that she relied on all the physical evidence, in addition to D's statements and her mother's statements, in reaching the diagnosis. *See State v. Ovendale*, 253 Or App 620, 633, 292 P3d 579 (2012), *rev den*, 353 Or 714 (2013) (evidence that the victim defecated on the floor after the alleged sodomy, which the examining nurse described as "interesting and somewhat concerning," was admissible because the nurse relied on both that physical evidence and the victim's statements).[10] And the physical evidence that she observed was in no way peripheral to her diagnosis: She described the evidence of the various physical and emotional symptoms as being "all significant factors" in her diagnosis. Simply put, the risk identified in *Beauvais*—that the jury will merely defer to the expert's assessment of the victim's credibility—was not present here. *Cf. State v. Lovern*, 234 Or App 502, 228 P3d 688 (2010) (the trial court plainly erred in admitting diagnosis of child sex abuse because the examining doctor expressly testified that the evidence neither confirmed nor refuted the diagnosis).

In arguing otherwise, defendant asserts that two parts of Grigsby's testimony show that she did not significantly rely on two pieces of physical evidence, the urinary tract infections and the hyperpigmentation. Defendant points to the fact that D was treated for urinary tract infections

---

[10] As defendant observes, although *Ovendale* predates *Beauvais*, we applied a similar test in *Ovendale* to the one ultimately adopted by the Supreme Court in *Beauvais*.

between October 2015 and January 2017, yet defendant did not live with the family or have contact with D between January 2015 and April 2016. Nonetheless, Grigsby said that that information would not "change [her] opinion[.]" Defendant seizes on that statement and argues that it demonstrates that Grigsby did not significantly rely on the urinary tract infections in reaching her diagnosis.

But that argument ignores the context of Grigsby's answer, which explained that the information about when defendant had contact with D would not change her opinion because the urinary tract infections could have begun earlier and gone undiagnosed. As she explained, children often have those infections for "a long time" before they start complaining about symptoms and she did not know

> "how long [D] had these urinary tract infections without getting treatment, because she did have these other like vaginal pain and things like that.

> "So it may have been that, you know, she didn't go to the doctor for these things, because her mom reported she did complain about those things, and the bed-wetting, but that it didn't always result in going to the doctor."

Thus, although Grigsby was not able to definitively place a time frame on when D's urinary tract infections may have started, that does not mean that she did not significantly rely on that physical evidence in reaching her diagnosis. To the extent that defendant believed that the timing of the diagnosed urinary tract infections was significant *vis à vis* D's contact with defendant, he was welcome to—and indeed, did—argue that point to the jury; it does not, however, render Grigsby's testimony inadmissible.

Similarly, defendant focuses on Grigsby's testimony that her discovery of the hyperpigmentation on D's labia did not "change [her] opinion" to argue that Grigsby did not significantly rely on the hyperpigmentation. Again, the full context of Grigsby's testimony shows that she *did* rely on that finding:

> "[Counsel]:  Is your testimony that this focal area of mild and distinct hyperpigmentation was critical or an essential component of your diagnosis?

"[Grigsby]:   So I can't remember all the things I was—
that we listed. I guess when you asked me that question,
there was a lot of information that came under consider-
ation in making the diagnosis, and that's like looking at
questioning anything else that this could be, and I would
say that the physical exam for me was consistent with all
the other information that had come in.

"* * * * *

"[Counsel]:   Let me see if I understand what you are
saying. So, you're saying the totality of the circumstances
all pushed you in one direction and this finding did not
push in some other direction and so it kind of fell within
the totality of what you were considering?

"[Grigsby]:   Yeah. It didn't change my opinion. I mean,
to—when I found that, I think that I wasn't expect—I was
expecting to find, you know, normal, but it was abnormal
and non-specific.

"So yes, I considered it—but I also had heard the inter-
view, you know, and so—and had also heard all the other
information.

"So, I think with a reasonable degree of medical cer-
tainty, that was my diagnosis, based on all of that
information."

In short, the whole of Grigsby's testimony demonstrates that
the trial court correctly found that Grigsby significantly
relied on the physical evidence.

We also disagree with defendant that Grigsby's
diagnosis failed to satisfy the first *Beauvais* element, that
the physical evidence "meaningfully corroborate" the abuse.
To be meaningfully corroborative, the evidence "must have
more than a speculative or insubstantial connection to the
diagnosis." *Beauvais*, 357 Or at 537. Grigsby expressly testi-
fied that the physical evidence corroborated the abuse, inas-
much as it was consistent with penile-vaginal penetration.
To be sure, as defendant points out, Grigsby also testified
that the physical evidence that she observed could have
causes other than sexual abuse. But that does not mean, as
defendant suggests, that the evidence is not meaningfully

corroborative. *See State v. Vidal*, 245 Or App 511, 514, 263 P3d 364 (2011), *rev den*, 351 Or 761 (2012) (although the examining nurse testified that the hymenal irregularities could be a "variation of normal" or "something besides abuse[,]" that evidence was nonetheless corroborative of the victim's disclosures of abuse). What *Beauvais* requires is that a child's report of abuse be corroborated by physical injuries or symptoms that an expert knows to be consistent with the alleged abuse; then, the diagnosis does not infringe on the role of the jury. Conversely, what *Beauvais* does not require is that the physical evidence can be corroborative only if it has a single cause—sexual abuse or assault. Given Grigsby's repeated explanations about how the physical evidence that she observed was connected to her diagnosis, the trial court correctly concluded that the evidence meaningfully corroborated her diagnosis.

Affirmed.

**AOYAGI, P. J.,** concurring.

I agree with the majority's disposition. However, I write separately to discuss the first assignment of error, regarding admission of Dr. Grigsby's medical diagnosis of child sexual abuse.

In *State v. Southard*, 347 Or 127, 141, 218 P3d 104 (2009), the Supreme Court held that a medical diagnosis of child sexual abuse that lacks corroborating physical evidence is generally inadmissible under OEC 403, because the danger of unfair prejudice substantially outweighs the probative value of such evidence. Six years later, in *State v. Beauvais*, 357 Or 524, 537-38, 354 P3d 680 (2015), the court held that a medical diagnosis of child sexual abuse that is corroborated by physical evidence is sometimes admissible under OEC 403. Essentially, *Beauvais* imposes three requirements for admissibility: (1) the physical evidence must "meaningfully corroborate the diagnosis," which requires something "more than a speculative or insubstantial connection to the diagnosis"; (2) the expert must "significantly rely" on the physical evidence in making the diagnosis; and (3) the diagnosis must involve a complex factual determination "that a lay person cannot make as well as an expert." *Id.* (internal quotation marks omitted).

The reasoning behind the *Beauvais* standard is that, when those three requirements are met, the expert "tells the jury something that it could not determine as well on its own," and there is less risk "that the trier of fact will improperly defer to what it reasonably could perceive to be a credibility-based evaluation by the expert." *Id.* at 537. The "probative force of the diagnosis is more likely to derive from the strength of the causal connection between the physical findings and the diagnosis rather than from the expert's assessment of the child's credibility." *Id.* at 538.

Applying that standard to this record, I cannot say that the majority is wrong to conclude that Grigsby's testimony satisfied the *Beauvais* requirements, particularly in light of how the standard was applied in *Beauvais* itself. That is why I concur in the majority opinion. At the same time, I question whether the danger of unfair prejudice does not in fact substantially outweigh the probative value of Grigsby's diagnosis. In my view, when a medical diagnosis of child sexual abuse relies primarily on a doctor's assessment of the credibility of statements made by the child and others—as appears to have been the case here—that diagnosis crosses into the impermissible territory of vouching, even if there is some corroborative physical evidence. At a minimum, I am concerned that the standard articulated in *Beauvais* creates too low of a bar in application, even if it makes sense in principle.

Oregon has an extremely strong prohibition against vouching. *See State v. Salas-Juarez*, 264 Or App 57, 63, 329 P3d 805, *rev den*, 356 Or 575 (2014) (recognizing that the Oregon Supreme Court has "amplified" the importance of the rule prohibiting vouching). "Because credibility determinations are the exclusive province of the jury, witnesses are categorically prohibited from expressing a view on whether another witness is 'telling the truth.'" *Davis v. Cain*, 304 Or App 356, 363, 467 P3d 816 (2020) (quoting *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983)). That rule applies to all witnesses, including experts. *Middleton*, 294 Or at 438 ("[I]n Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth."). Indeed, it is such a strong rule that it can be plain error for a trial court not to intervene to prevent testimony

that comments on another witness's credibility. *E.g.*, *State v. McQuisten*, 97 Or App 517, 520, 776 P2d 1304 (1989).

It is also well-understood in Oregon that jurors tend to give greater weight to scientific evidence, which would include expert medical diagnoses. *See, e.g.*, *State v. Henley*, 363 Or 284, 298-99, 422 P3d 217 (2018) (recognizing the "significant persuasive value" that lay people give to evidence that is perceived to "rest on science"); *State v. O'Key*, 321 Or 285, 291, 899 P2d 663 (1995) ("Evidence perceived by lay jurors to be scientific in nature possesses an unusually high degree of persuasive power.").

Considering those principles together, it is readily apparent that vouching testimony by a doctor creates an especially high risk of the jury ceding its role as the exclusive arbiter of credibility. Then add to the mix that the witness whose credibility is at issue is a child, that the trial involves the emotionally charged issue of child sexual abuse, and that the child's credibility goes to the heart of the prosecution's case. "In many cases where credibility is critical to the outcome, even a single 'vouching' statement by a witness *** with years of experience and training in the field of child abuse prevention, can be given considerable weight by the jury." *State v. Ross*, 271 Or App 1, 7, 349 P3d 620, *rev den*, 357 Or 743 (2015).

Given the strong prohibition on vouching, the greater weight that expert medical evidence carries with juries, and the frequently vital role that witness credibility has in child sexual abuse cases, I find it difficult to understand how a medical diagnosis of child sexual abuse that relies primarily on a doctor's assessment of the credibility of the child and others is admissible under OEC 403. Even if there is *some* physical evidence to corroborate the doctor's credibility assessment, the primary basis for the diagnosis is still a credibility assessment. Vouching is not normally rendered admissible by a witness's explanation as to *why* the witness believes someone to be truthful or untruthful, even though such information would serve a corroborative function.

According to *Beauvais*, 357 Or at 538, when a medical diagnosis of child sexual abuse meets its three

requirements, the "probative force of the diagnosis is more likely to derive from the strength of the causal connection between the physical findings and the diagnosis rather than from the expert's assessment of the child's credibility." It is true that a juror who is unpersuaded by *some* of a doctor's reasons for believing a child's allegations (reasons related to physical evidence) may be less likely to think that the diagnosis is correct. But how does that shift the balance far enough that the danger of unfair prejudice no longer substantially outweighs the probative value of the diagnosis?

As this case and others demonstrate, it is not unusual for physical conditions to have multiple possible causes. *See State v. Vidal*, 245 Or App 511, 517, 263 P3d 364 (2011), *rev den*, 351 Or 761 (2012) (evidence of hymenal irregularities that could be a "variation of normal" or "something besides abuse" was nonetheless corroborative physical evidence of sexual abuse). That creates a real problem for OEC 403 purposes, at least when a medical diagnosis is founded *primarily* on the doctor's assessment of the credibility of the child and others, and any physical evidence serves only a *corroborative* function. Even setting aside the risk of confirmation bias, there is always going to be a risk that jurors will rely on the *credibility* aspect of the diagnosis.

To illustrate, consider a doctor who diagnoses X with child sexual abuse, based primarily on statements by X and her family, but also relying on some physical evidence that could be unrelated but that the doctor considers corroborative. If a juror finds the doctor's explanation of the physical evidence persuasive, that makes it more likely that the juror will accept the doctor's entire diagnosis, *including* the portion based on a credibility assessment. Conversely, if the juror is unpersuaded that the physical evidence is corroborative, it does not necessarily follow that the juror will disregard the entire diagnosis, which, after all, is based primarily on other information. It is not obvious why a medical diagnosis that does not rely on any physical evidence is automatically inadmissible under OEC 403 (*Southard*), but a medical diagnosis that relies on physical evidence without *depending* on it is admissible (*Beauvais*), even though the jury is free to disregard the physical evidence and still accept the diagnosis.

In sum, I concur in the majority opinion because I believe that its reasoning is consistent with *Beauvais*. At the same time, I am concerned that, in application, the *Beauvais* requirements do not actually ensure that the probative value of a medical diagnosis of child sexual abuse—particularly a diagnosis that is based primarily on the doctor's credibility assessments—is not substantially outweighed by the danger of unfair prejudice. In my view, a refinement of the standard, or at least the development of limiting instructions, may be necessary to stay true to OEC 403 in these cases.

Accordingly, I respectfully concur.