No. 200 March 18, 2026 769

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

ANTONIO ALEJANDRO CHARLEMAGNE,
*Petitioner,*

*v.*

BOARD OF PAROLE AND POST-PRISON
SUPERVISION,
*Respondent.*
A183595

Argued and submitted February 19, 2026.

Stacy M. Du Clos, Deputy Public Defender, argued the cause for petitioner. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission. Antonio A. Charlemagne filed the supplemental briefs *pro se.*

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, Chief Lagesen, Judge, and Kamins, Judge.

KAMINS, J.

Reversed and remanded.

Lagesen, C. J., concurring.

**KAMINS, J.**

Petitioner seeks judicial review of a final order of the Board of Parole and Post-Prison Supervision (the board) deferring his projected parole release date for 24 months. The board determined that petitioner suffers from a present severe emotional disturbance (PSED) that makes him a danger to the health or safety of the community, so as to permit the deferral of petitioner's parole release date under ORS 144.125(3) (1983), *amended by* Or Laws 1987, ch 320 § 53; Or Laws 1989, ch 790 § 68; Or Laws 1993, ch 334, § 1; Or Laws 1999, ch 141, § 1; Or Laws 2009, ch 660, § 3.[1] We agree with petitioner that the board's order lacked substantial evidence and substantial reason, ORS 144.335(3); ORS 183.482(8), and thus reverse and remand.[2]

Petitioner was convicted in 1985 of murdering his mother and assaulting his father in a violent attack and was sentenced to life with the possibility of parole. When he first arrived in prison, petitioner was given a projected release date of April 2000. That date was pushed back, several times, based on the board's conclusion that petitioner suffered from a PSED that rendered him dangerous.

In the order giving rise to petitioner's appeal, the board reached the same conclusion—that petitioner suffers from a PSED that renders him dangerous—relying heavily on petitioner's most recent forensic mental health evaluation, written by Dr. Millkey. That report evaluated petitioner based on, among other things, an interview, Department of Corrections records, a presentencing investigation from 1985, petitioner's prior mental health evaluations, petitioner's parole plan, and specific tests related to petitioner's personality and risk of violence.

In a section titled "DIAGNOSIS," Millkey wrote:

---

[1] ORS 144.125(3) (1983) provided:

"If a psychiatric or psychological diagnosis of present severe emotional disturbance such as to constitute a danger to the health or safety of the community has been made with respect to the prisoner, the board may order the postponement of the scheduled parole release until a specified future date."

[2] Our disposition obviates the need to address petitioner's remaining assignments of error, which concern circumstances in his parole hearing and the board's authority to defer his release date.

"DSM-5 DIAGNOSIS

"Antisocial Personality Traits

"Cannabis Use Disorder

"Alcohol Use Disorder."[3]

Millkey did not provide any other diagnoses. In that same section, however, Millkey explained his diagnostic reasoning:

> "[Petitioner] has antisocial personality traits, although it is not clear that he meets criteria for a personality disorder. He has a history of failure to conform to social norms, aggressiveness, impulsivity, and irresponsibility. [Petitioner] has a history of behavioral difficulties in prison resulting in placement in segregated housing, although he has not had a disciplinary referral since 2017. However, [petitioner's] cognitive style suggests that he is prone to not accepting full responsibility and attributing his behavior to externalities (e.g., blaming his aggressive behaviors on the actions of others)."

Millkey also opined that petitioner's risk for future violence can be managed in the community with a risk management plan. After a hearing, the board deferred petitioner's release for 24 months. In its order deferring petitioner's release, the board explained that, "[b]ased on the doctor's report and diagnosis, coupled with all the information that the [b]oard is considering, the [b]oard concludes that [petitioner] suffers from a [PSED] that constitutes a danger to the health or safety of the community." The board further explained that its decision was, in part, based on Millkey's psychological report which "diagnosed [petitioner] with the DSM-5 Diagnosis of Antisocial Personality Traits," and that it was petitioner's diagnosis, coupled with petitioner's history of violence and lack of insight, remorse, or empathy, that led it to conclude that petitioner was suffering from a PSED that rendered him dangerous.

Petitioner requested administrative review of the board's decision. In his request, petitioner argued that substantial evidence did not support the PSED finding, because Millkey only diagnosed petitioner with "traits" and

---

[3] On appeal, the board acknowledges that it did not consider the diagnoses of Cannabis Use Disorder or Alcohol Use Disorder as bases for a PSED.

not a personality "disorder." The board responded that the PSED determination is a legal determination for the board to make, and that, although a psychiatric or psychological diagnosis is a prerequisite to its consideration, the diagnosis alone does not dictate the eventual result. *See Weidner v. Armenakis*, 154 Or App 12, 17, 959 P2d 623 (1998), *withdrawn by order*, *reaffirmed in Merrill v. Johnson*, 155 Or App 295, 964 P2d 284, *rev den*, 328 Or 40 (1998) (so stating).[4] The board affirmed its decision, and this petition for judicial review followed.

We review the board's order for legal error, *Morrison v. Board of Parole*, 277 Or App 861, 863, 374 P3d 948, *rev den*, 360 Or 465 (2016), and substantial evidence, ORS 144.335(1), (3); ORS 183.482(8), including substantial reason, *Jenkins v. Board of Parole*, 356 Or 186, 195, 335 P3d 828 (2014). "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." ORS 183.482(8) (c). In reviewing for substantial evidence, we defer to the board's reasonable inferences and do not reweigh the evidence. *Mendacino v. Board of Parole*, 287 Or App 822, 834, 404 P3d 1048 (2017), *rev den*, 362 Or 508 (2018). Substantial reason, on the other hand, requires that the board "articulate a 'rational connection between the facts and the legal conclusions it draws from them.'" *Jenkins*, 356 Or at 195 (quoting *Ross v. Springfield School Dist. No. 19*, 294 Or 357, 370, 657 P2d 188 (1982)).

On appeal, petitioner reiterates his argument that the board's PSED conclusion lacked substantial evidence and substantial reason because it was missing a necessary fact: a psychiatric or psychological diagnosis of a disorder. We agree. Although the PSED standard is a legal determination, *Weidner,* 154 Or App at 17 n 2, the diagnosis required to support it is a factual one. *See State v. Meighan*, 324 Or App 136, 150, 525 P3d 78, *rev den*, 371 Or 175 (2023) (noting that, under certain circumstances, diagnosis involves a "complex factual determination"). A

---

[4] Although *Merrill* is the precedential case, as has been the practice of the appellate courts, we refer to and cite *Weidner*, because that is the case in which we first announced our reasoning. *Gordon v. Board of Parole*, 266 Or App 405, 408 n 4, 338 P3d 185 (2014), *rev den*, 357 Or 299 (2015)

psychiatric or psychological diagnosis of a disorder is a "prerequisite" from which the board draws its conclusion of a PSED. *Christenson v. Thompson*, 176 Or App 54, 59, 31 P3d 449 (2001). "Diagnosis" is the "'art or act of identifying a disease from its signs and symptoms.'" *Id.* (quoting *Webster's Third New Int'l Dictionary* 622 (unabridged ed 1996) in interpreting ORS 144.125(3)). "The standard and commonly recognized psychiatric and psychological diagnoses are set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM) ***." *Weidner*, 154 Or App at 17.

As mentioned, Millkey included the words "Antisocial Personality Traits" under the heading of "DSM-5 Diagnosis," but also explained that he was unable to diagnose petitioner with a personality disorder, because petitioner did not meet the criteria for a personality disorder. Under the DSM-5, personality traits are different from disorders. *See* DSM-5 at 647 (defining "personality traits" as "enduring patterns of perceiving, relating to, and thinking about the environment and oneself that are exhibited in a wide range of social and personal contexts"). Personality traits constitute disorders "*only when* [the traits] are inflexible and maladaptive and cause significant functional impairment or subjective distress." *Id.* (emphasis added). In other words, while personality traits may be a necessary component of a disorder, they do not, standing alone, constitute a disorder. Millkey's report thus lacked the necessary prerequisite for the board's conclusion. *See also Newcomb v. Thompson*, 176 Or App 167, 168, 33 P3d 319 (2001) (psychological report that diagnosed the plaintiff merely with "some elements" of a personality disorder insufficient to support a PSED conclusion). Or, put differently, the board legally erred by interpreting our case law to mean that a psychological diagnosis of "Antisocial Personality Traits" was sufficient to support a PSED conclusion. The PSED finding was thus not supported by substantial evidence and substantial reason.

The board, however, raises two substantively new arguments on appeal as to why we should affirm its order. First, the board argues that the record entitled it to find that Millkey actually diagnosed petitioner with a different

disorder, Unspecified Personality Disorder, notwithstanding the fact that Millkey did not include that diagnosis in his report. That disorder, as defined by the DSM-5, applies when there are symptoms present of a personality disorder, but a person's characteristics nonetheless do not meet "the full criteria" for a particular personality disorder and the clinician chooses not to specify the reason that the criteria are not met. Second, the board argues that case law requiring a DSM diagnosis of a disorder by a psychiatrist or psychologist as a prerequisite for a PSED conclusion is plainly wrong and should be overruled.

We begin with the board's argument that the board was entitled to read Millkey's "DSM-5 Diagnosis" as "the equivalent" of an Unspecified Personality Disorder diagnosis. That argument is unpersuasive, as it fails to grapple with our scope of review. On judicial review, we look to the order *itself* for substantial evidence and substantial reason. *See Washington v. Board of Parole*, 294 Or App 497, 499, 432 P3d 372 (2018) ("The issue in this case, then, is: Does the *board's order* contain a logical explanation of the connection between adequately supported facts and the board's conclusion that [the] petitioner has a psychological condition that is present, severe, and makes him a danger to the health or safety of the community?" (Emphasis added.)). Nowhere in the board's order did the board explain that it was finding that petitioner had a diagnosis of Unspecified Personality Disorder, or that it was concluding that petitioner suffered from a PSED that rendered him dangerous due to a diagnosis of Unspecified Personality Disorder. Rather, the only psychiatric diagnosis identified by the board to support the legal finding of a PSED was "Antisocial Personality Traits," *not* Unspecified Personality Disorder. And, the board expressly relied on Millkey's report—which, in turn, explicitly provided that it could not diagnose petitioner with *any* personality disorder. The board's argument thus fails.

The board's argument requesting that we overrule our case law requiring a psychological or psychiatric diagnosis as a prerequisite is similarly unavailing. In order to overrule our precedents, we must be convinced that those cases are "plainly wrong," which is "a rigorous standard, satisfied

only in exceptional circumstances." *State v. Civil*, 283 Or App 395, 417, 388 P3d 1185 (2017). The board contends that our previous decision in *Weidner* did not undertake a proper statutory interpretation analysis, and had we then looked to the text, context, and legislative history of ORS 144.125(3), we would have found no requirement of a psychological or psychiatric diagnosis as a prerequisite. The board also contends that the language in *Weidner* was dicta and subsequent cases that rely on it for a holding are plainly wrong.

In *Weidner*, the issue was whether ORS 144.125(3) contained a requirement that a psychiatrist or psychologist diagnose a petitioner with a "severe emotional disorder" before the board could defer release on the basis of a PSED. 155 Or App at 19. We concluded that the statute contained no such requirement. *Id.* at 19-20. We reasoned that "the text of ORS 144.125(3) (1991),[5] *particularly when read in the context* of other related statutes" contemplated that the board could "consider all information," and not just the psychiatric or psychological diagnosis, "in reaching a conclusion about whether a prisoner suffers from a [PSED]." *Id.* at 17-18 (emphasis added). We noted, however, that "[a]lthough a psychiatric or psychological diagnosis is a prerequisite to the [b]oard's consideration of whether the statutory criteria have been met, that diagnosis alone does not dictate the result." *Id.* at 19-20. Even if that language from *Weidner* could be construed as dicta, the board has not persuaded us that its reasoning is plainly wrong. *See Engwiler v. Persson / Dept. of Corrections*, 354 Or 549, 559 n 6, 316 P3d 264 (2013) ("Of course, even if the court's prior construction were *dictum* that would not, by itself, mean that it was incorrect and without any force whatsoever. It merely [would mean] that we are not *required* to follow it as precedent. The prior construction, even if *dictum,* could have persuasive force because of the soundness of its reasoning." (Internal quotation marks omitted.)).

As we have explained, the board legally erred in its interpretation of our case law, and its PSED conclusion was not supported by substantial evidence or substantial reason. That means that petitioner is entitled to a reinstatement

---

[5] Although *Weidner* interpreted a more recent version of ORS 144.125(3), the statutory language it interpreted is identical to the version applied to petitioner.

of his release date, as the board cannot demonstrate that, at the time of his hearing, petitioner suffered from a PSED that rendered him dangerous. *See Porter v. Board of Parole*, 281 Or App 237, 245, 383 P3d 427 (2016), *rev den*, 361 Or 100 (2017) (observing that after a release date has passed, "it does not suffice to later find a reason to have postponed [a petitioner's] release"); *Rivas v. Persson*, 256 Or App 829, 835-36, 304 P3d 765 (2013), *rev dismissed*, 354 Or 841 (2014) ("[I]f a release date was scheduled and elapsed without the board *first* having found a valid reason to postpone release, but the inmate was erroneously not released, later events cannot furnish a basis for postponing release; the inmate is entitled to immediate release." (Emphasis added.)). Accordingly, there is no basis on which to defer petitioner's release date associated with the sentence giving rise to this appeal. We therefore reverse and remand with directions to reinstate petitioner's release date.

Reversed and remanded.

**LAGESEN, C. J.,** concurring.

I concur in the majority opinion fully. I write separately to address the board's assertion that we should reconsider and overrule *Weidner v. Armenakis*, 154 Or App 12, 959 P2d 623 (1998) (en banc), *withdrawn by order*, *reaffirmed in Merrill v. Johnson*, 155 Or App 295, 964 P2d 284 (1998); *Christenson v. Thompson*, 176 Or App 54, 31 P3d 449 (2001); and *Newcomb v. Thompson*, 176 Or App 167, 33 P3d 319 (2001). The board asserts that we should undertake that exercise because we did not employ the statutory construction methodology announced in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), and *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). In the board's view, an application of that statutory construction methodology to the relevant version of ORS 144.125 demonstrates that our conclusions in those cases are plainly wrong, such that the right thing to do is overrule them.

I tend to agree with the board that the construction of ORS 144.125 adopted by the en banc majority opinion in *Weidner*—and built upon by *Christenson* and *Newcomb*—might be wrong. The dissenting opinion's analysis in *Weidner*

suggests as much. *Weidner*, 154 Or App at 20-23 (Warren, J., dissenting).[1] That analysis rested on the ordinary meaning of the plain text of ORS 144.125 and, for that reason, has the hallmarks of a typical *PGE* analysis. But the *Weidner* majority opinion has been the settled law of this court for 28 years, and I am unpersuaded that there is a reason to devote our limited institutional resources to the destabilizing exercise of re-evaluating our longstanding precedent. That is particularly so in a case like this one in which our predecessors devoted the resources of the en banc court to resolving the question—twice.

I recognize that the proper construction of the statute is important. The proper construction of the statute at issue here is particularly important because it affects both liberty and, potentially, public safety. But we are Oregon's intermediate appellate court, and we were not built to be the last word on the matter, or on any important question of law. Our role, to the extent we are called upon to announce law in addition to correcting errors, is to adjudicate thoughtfully, fairly, and impartially the legal questions presented to us, and then to apply the precedent we set in an even-handed way. Once we have issued precedent providing an authoritative interpretation or construction of an important statute, like the one at issue here, ordinarily it is our responsibility to apply it to similarly-situated cases, and it is the responsibility of the Supreme Court—our state's primary law-announcing court—to address whether our interpretation or construction is the correct one.

At the time we decided *Weidner*, the Supreme Court appears to have viewed its role and responsibility the same way. The Court allowed review, ultimately vacated our decision without addressing the merits, and remanded with directions to dismiss because the case had become moot. *Weidner v. Armenakis*, 327 Or 317, 966 P2d 220 (1998). Our en banc court almost immediately readopted the reasoning

---

[1] I note that if we were to overrule *Weidner* and apply the construction of the statute advanced by the dissenting opinion in that case (a construction that the board does not advocate), the result in this case would be the same. Under the analysis in the *Weidner* dissenting opinion, the fact that there is no psychiatric or psychological diagnosis of a present severe emotional disturbance such as to constitute a danger to the health or safety of the community would preclude the board from deferring petitioner's release date. *Id.* at 21 (Warren, J., dissenting).

of the vacated decision, dividing in exactly the same way. *See Merrill*, 155 Or App at 296. That time, though, the Supreme Court declined to take on the question. *Merrill v. Johnson*, 328 Or 40, 977 P2d 1170 (1998). The Court did so, notwithstanding the fact that the matter satisfied the lion's share of the Court's criteria for allowing discretionary review under ORAP 9.07 both then and now, making it a textbook case for discretionary review by a law-announcing court. ORAP 9.07 (adopted effective 1994); ORAP 9.07 (effective January 1, 2025). The case presented an important recurring question of law involving the interpretation of a statute that would apply to a lot of people—one of first impression for the Supreme Court—that had been decided (possibly incorrectly) in a precedential opinion by a divided en banc Court of Appeals. ORAP 9.07(1)(b), (2), (3), (4), (5), (7), (8), (11), (12), (13), (14). The Supreme Court's exercise of discretion not to consider the issue means our court has had the last word on the meaning of this important statute for close to three decades.

The Supreme Court's discretionary decision not to step in to address an important question of statutory interpretation within a reasonable timeframe has costs to the orderly administration of justice. In this case, it means that some people may have been erroneously deprived of liberty or, if the board is correct in its reading, that dangerous people may have been paroled prematurely.

Beyond that, when a state's law-announcing court does not timely review an intermediate appellate court's interpretation of a statute that will govern many cases, it allows for practices to develop and entrench around possibly incorrect interpretations of statutes that, as a matter of system design, were not intended to be final. That, in turn, has the potential to give rise to long-term practices that may run counter to the rule of law. *See, e.g.*, *State v. Hubbell*, 314 Or App 844, 848, 500 P3d 728 (2021), *aff'd*, 371 Or 340 (2023) (concluding that, as a result of Court of Appeals' mistaken interpretation of statute, attempt crimes had wrongfully been treated as completed offenses); *State v Herried, Gray & Clagget*, 3 Or App 462, 464, 474 P2d 358 (1970) (construing phrase "memorandum decision" in ORS 19.435 (*formerly*

ORS 19.180) to permit the issuance of decisions unsupported by articulated reasons, stating that doing so was "a practice which is becoming increasingly widespread among appellate courts of other jurisdictions"); Aliza Milner, *Written Opinions in State Intermediate Appellate Courts: Current Landscapes and the AI Horizon*, 38 Geo J Legal Ethics 273, 282-83 (2025) (noting that 33 states affirmatively require explanatory writings in appeals, and identifying Oregon as one of only nine states that allow for intermediate appellate courts "to decide at least certain appeals without explanatory writing"). And, one way or another, the longer a state's law-announcing court waits to address an important question of state law, the more likely it is that people, as a practical matter, will have come to rely on the intermediate court's decision as settling the law. That means the law-announcing court's delay risks creating disruption that could have been avoided by prompter institutional engagement.

Other states have mechanisms in place to safeguard against this. New Jersey, for example, provides for Supreme Court review as a matter of right when there is a dissent in the intermediate appellate court. NJ RAR 2:2-1(a)(2). In Idaho, where appeals are filed in the Supreme Court and then transferred to the Court of Appeals, the Supreme Court is ordinarily expected to retain cases "in which there are significant issues involving clarification or development of the law, or which present a question of first impression." Idaho Appellate Rule 108(b). Oregon would benefit from discussing something similar, so as to better ensure the timely ultimate resolution of important legal questions by our state's law-announcing court.